**2020 IL 124107**


# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 124107)

MARY LEWIS *et al.*, Appellees, v. LEAD INDUSTRIES ASSOCIATION *et al.* (Atlantic Richfield Company *et al.*, Appellants).

*Opinion filed May 21, 2020.*


JUSTICE NEVILLE delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Garman, Karmeier, and Theis concurred in the judgment and opinion.

Justices Kilbride and Michael J. Burke took no part in the decision.


## OPINION

¶ 1 Plaintiffs, Mary Lewis, Tashswan Banks, and Kathleen O'Sullivan, filed a class action in the circuit court of Cook County against defendants, Atlantic Richfield Company; ConAgra Grocery Products, Inc.; NL Industries, Inc.; and the Sherwin-Williams Company. Plaintiffs sought to recover the costs of blood lead screening,

which their children underwent as required by the Lead Poisoning Prevention Act (Act) (410 ILCS 45/1 *et seq.* (West 2000)). The circuit court granted summary judgment in favor of defendants. The appellate court reversed. 2018 IL App (1st) 172894. This court allowed defendants' petition for leave to appeal (Ill. S. Ct. R. 315(a) (eff. July 1, 2018)). We hold that plaintiffs who do not suffer any economic loss cannot maintain a tort action that is based on a claim that alleges solely an economic injury and no physical injury or property damage. Accordingly, we reverse the judgment of the appellate court, affirm the judgment of the circuit court, and remand to the circuit court for further proceedings.

¶ 2                                                    I. BACKGROUND

¶ 3        Nineteen years ago, plaintiffs Mary Lewis, Tashswan Banks, and Kathleen O'Sullivan, on behalf of themselves and others similarly situated, filed the instant class-action lawsuit against four defendants, each of which is a former manufacturer of white lead pigments or the alleged corporate successor to such a manufacturer. Relevant here, plaintiffs' second amended class action complaint alleged six counts that were captioned as follows: (1) intentional failure to warn, (2) supplier liability, (3) fraud on the public, (4) unjust enrichment, (5) common-law public nuisance, and (6) civil conspiracy. The circuit court dismissed all six counts. The appellate court affirmed the dismissal of the first five counts, which are not at issue here. However, the appellate court reversed the dismissal of count VI. *Lewis v. Lead Industries Ass'n*, 342 Ill. App. 3d 95 (2003) (*Lewis I*) Subsequently, the appellate court reversed the grant of summary judgment in favor of defendants on count VI. *Lewis v. Lead Industries Ass'n*, No. 1-05-0974 (2006) (unpublished order under Illinois Supreme Court Rule 23) (*Lewis II*). The sole surviving count is count VI, which is repled in plaintiffs' third amended complaint.

¶ 4        Plaintiffs sought to recover the costs of blood-lead screening, which their children underwent as required by the Act (410 ILCS 45/1 *et seq.* (West 2000)). Plaintiffs' complaint specifically excludes any claim for recovery for physical injury to their children. Instead, plaintiffs' claim is solely one for economic injury to the parents in relation to the costs incurred for the lead screening. The class was certified in 2008, and despite attacks from both sides, the class definition has remained essentially the same:

"the parents or legal guardians of children who, between August 18, 1995, and February 19, 2008, were between six months and six years of age and, during that age bracket, lived in zip codes identified by the Illinois Department of Public Health as 'high risk' areas pursuant to section 6.2(a) of the Act (410 ILCS 45/6.2(a) (West 2000)) and had a venous or blood capillary test for lead toxicity, excluding such parents and legal guardians who incurred no expense, obligation or liability for lead toxicity testing of their children."

¶ 5        On October 6, 2016, defendants filed a motion for summary judgment, contending that none of the three named plaintiffs incurred any expense, obligation, or liability for the lead toxicity testing of their children. Supported by the deposition testimony of plaintiffs Lewis and Banks, defendants asserted that both were Medicaid recipients when their children were tested and neither paid for those tests. Defendants claimed that Lewis and Banks could not prove any economic injury that would be essential to their claims because (1) Medicaid paid the full costs of the screenings, (2) the two received no demands for payment from the medical providers who performed tests or from the Illinois department responsible for administering the Medicaid program, and (3) state and federal laws in fact prohibit the medical providers or Medicaid itself from seeking reimbursement from them. Thus, there is no possibility plaintiffs will incur any cost as a result of their children's screenings. With respect to plaintiff O'Sullivan, defendants asserted that there was no evidence to show that she paid anything for her child's screening or that her plan would have required payment.

¶ 6        In response, plaintiffs conceded that Lewis and Banks did not pay for the tests. But they argued that a recipient of medical services or treatment (and in the case of a child, the recipient's parents) incurs the expense of the services or treatment, even where the actual cost of the expense is paid by a third-party payor. Plaintiffs argued that, if they recovered the cost of the testing, the State, which paid the providers for the tests, could seek reimbursement from that recovery. Plaintiffs also argued that, under the collateral source rule, Medicaid's payment for the tests does not negate plaintiffs' economic injury but instead gives them the right to be reimbursed for the costs of the screenings even though a collateral source paid the actual costs.

¶ 7        The circuit court granted defendants' motion for summary judgment. As to plaintiffs Lewis and Banks, the court ruled that they suffered no injury. They did

not pay for the test themselves and incurred no obligation or liability for the costs because state and federal law bar both Medicaid and the service providers from seeking reimbursement from these plaintiffs. The court noted that, if a Medicaid recipient recovered the costs of medical care in a tort action, the State might have a claim to a portion of that tort recovery. But such a claim could not constitute an injury to plaintiffs, the court held. This is because any "recoupment [the State could obtain] comes from the judgment *against the wrongdoer* before the net judgment is paid to the recipient, not from the recipient herself." (Emphasis in original.) Thus, plaintiffs have no "present, or even a prospective, obligation or liability to the State with respect to the medical screening."

¶ 8        The circuit court also rejected plaintiffs' argument that the collateral source rule allowed them to recover in the absence of an actual injury. The court held that the collateral source rule applies only to the measurement of damages in bodily injury cases and cannot be used to overcome plaintiffs' lack of a present expense, obligation, or liability arising from their children's blood screening tests.

¶ 9        The circuit court also dismissed O'Sullivan's claim but on the slightly different ground that she had private health insurance rather than Medicaid yet was unable to present evidence that either she or her insurer had paid anything for her children's lead screening tests. Thus, like the other two plaintiffs, the circuit court found that O'Sullivan was not a member of the defined class.

¶ 10       Plaintiffs' counsel was given time to name one or more new class representatives, but counsel waived that opportunity and did not name a new representative. Instead, plaintiffs moved for certification pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), permitting immediate appeal of the order granting summary judgment on behalf of defendants. The circuit court granted the motion for Rule 304(a) certification as to Banks and Lewis but denied it with respect to O'Sullivan. The court explained that its summary judgment ruling rested upon a legal analysis applicable to all Medicaid recipients so that immediate appellate review would expedite the disposition of the entire case without risking piecemeal appellate review but declined to certify the order dismissing O'Sullivan because her claim rested on fact-based determinations specific to her that would not necessarily be presented by all potential class members.

¶ 11       On appeal of the circuit court's summary judgment order against Lewis and Banks, the appellate court reversed. See 2018 IL App (1st) 172894. It began its analysis by conceding that neither plaintiff paid any portion of the cost of her child's lead screening test and that those costs were paid entirely by Medicaid. *Id.* ¶ 7. It also agreed that neither plaintiff is obligated to reimburse the State for all, or any portion, of the payment made for the testing of their children. *Id.* ¶ 9. But the court nonetheless held that plaintiffs had a legally sufficient claim of injury because they incurred an obligation for the cost of the tests. According to the appellate court, this was because the Rights of Married Persons Act (Family Expense Act) (750 ILCS 65/15 (West 2000)) "codifies the common-law rule making parents liable for the expenses of their minor children." (Internal quotation marks omitted.) 2018 IL App (1st) 172894, ¶ 10. The court also held that the collateral source rule—which provides that benefits received by an injured party from a source wholly independent of, and collateral to, the tortfeasor will not diminish the damages recoverable from the tortfeasor (see *Wills v. Foster*, 229 Ill. 2d 393, 418 (2008))—applied to this case "involving a purely economic injury," and so plaintiffs' claim should be allowed to go forward. 2018 IL App (1st) 172894, ¶¶ 12-13. The appellate court did not specifically address defendants' additional, but related, argument that plaintiffs lacked standing to bring their claim because they suffered no injury.

¶ 12       Defendants appeal to this court. We granted the Illinois Manufacturers' Association and the National Association of Manufacturers leave to submit an *amici curiae* brief in support of defendants. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 13       II. ANALYSIS

¶ 14       This matter is before us on the appellate court's reversal of the circuit court's grant of summary judgment in favor of defendants. The purpose of summary judgment is not to try a question of fact but, rather, to determine whether a genuine issue of material fact exists. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008); *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 305 (2005). Summary judgment is appropriate only where "the pleadings, depositions, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018).

¶ 15 In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent. A genuine issue of material fact precluding summary judgment exists where the material facts are disputed or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts. Summary judgment is a drastic means of disposing of litigation and, therefore, should be granted only where the right of the moving party is clear and free from doubt. *Adames v. Sheahan*, 233 Ill. 2d 276, 295-96 (2009); *Williams*, 228 Ill. 2d at 417. If the plaintiff fails to establish any element of the cause of action, summary judgment for the defendant is appropriate. *Williams*, 228 Ill. 2d at 417; *Governmental Interinsurance Exchange v. Judge*, 221 Ill. 2d 195, 215 (2006); *Morris v. Margulis*, 197 Ill. 2d 28, 35 (2001). In appeals from summary judgment rulings, the standard of review is *de novo*. *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 20; *Williams*, 228 Ill. 2d at 417.

¶ 16 The issues that the parties present to this court are shaped by the nature of plaintiffs' claim, the relief they seek, and the class exclusion of "such parents or legal guardians who incurred no expense, obligation or liability for lead toxicity testing of their children." Thus, we begin our analysis by identifying the cause of action that plaintiffs have attempted to plead in this case.

¶ 17                                  A. Civil Conspiracy

¶ 18 Counsel for plaintiffs had some difficulty at oral argument trying to explain the tort theory they were proceeding upon. However, in *Lewis II*, No. 1-05-0974 (2006) (unpublished order under Illinois Supreme Court Rule 23), the appellate court distilled the underlying wrong described in this sole surviving count of plaintiffs' complaint as follows:

"[O]nce *** defendants *** became aware of the hazards of lead-based paints in 'the 1920's' they implemented and carried out a plan 'to conceal and mislead the public regarding the hazards of lead paint by, among other things, agreeing

to form, fund and support [the Lead Industries Association, Inc., or LEAD].' Through LEAD *** defendants marketed and promoted the use of lead pigments and lead-based paints; suppressed, discouraged, and retarded research, regulation, and public dissemination of information concerning the dangerous properties of lead-based paints; and concealed and misled the public about medical and scientific data indicating that lead-based paints were dangerous to children."

Plaintiff brings this claim under the tort theory of civil conspiracy.

¶ 19    "Illinois recognizes civil conspiracy as a distinct cause of action." *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 486 (1998). Civil conspiracy is defined as a combination of two or more persons for the purpose of accomplishing, by some concerted action, either an unlawful purpose or a lawful purpose by unlawful means. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133 (1999). "The function of a [civil] conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's acts." *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62 (1994).

¶ 20    To state a claim for civil conspiracy, a plaintiff must allege an agreement and a tortious act committed in furtherance of that agreement. *McClure*, 188 Ill. 2d at 133. "[T]he gist of a conspiracy claim is not the agreement itself, but the tortious acts performed in furtherance of the agreement." *Adcock*, 164 Ill. 2d at 63. Civil conspiracy requires proof that a defendant " 'knowingly and voluntarily participates in a common scheme to commit an unlawful act or a lawful act in an unlawful manner.' " *McClure*, 188 Ill. 2d at 133 (quoting *Adcock*, 164 Ill. 2d at 64). Further, "once the conspiracy is formed, all of its members are liable for injuries caused by any unlawful acts performed pursuant to and in furtherance of the conspiracy." *Adcock*, 164 Ill. 2d at 65. In summary, to prevail on a theory of civil conspiracy, a plaintiff must plead and prove (1) the existence of an agreement between two or more persons (2) to participate in an unlawful act or a lawful act in an unlawful manner, (3) that an overt act was performed by one of the parties pursuant to and in furtherance of a common scheme, and (4) an injury caused by the unlawful overt act. See *Reuter v. MasterCard International, Inc.*, 397 Ill. App. 3d 915, 927 (2010); *Canel & Hale, Ltd. v. Tobin*, 304 Ill. App. 3d 906, 920 (1999).

¶ 21     Many cases have been filed involving situations where litigants have sought to recover for personal injuries or property damage as a result of injury caused by lead-based paints or other similarly unreasonably dangerous products. See, *e.g.*, *Abbasi v. Paraskevoulakos*, 187 Ill. 2d 386, 393 (1999); *Board of Education of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 449 (1989). Plaintiffs here, however, have taken a different route. Plaintiffs allege that, as a result of a conspiracy to conceal and misrepresent the dangers of lead-based paint, particularly in housing, the use of lead-based paint continued well after it should have otherwise ended, and one of the results was the need for the enactment of the statute that requires their children to be screened. Plaintiffs are not suing for personal injuries or property damage. Rather, plaintiffs are suing only to recover the cost of the mandatory lead screening.

¶ 22                        B. Necessity of Actual Economic Loss

¶ 23     Before this court, defendants contend that this case involves an intangible economic injury. Defendants argue that a plaintiff seeking to recover for an intangible economic injury must show that an actual out-of-pocket loss has occurred or is reasonably certain to occur. Plaintiffs claim that their injury was the cost they *incurred* to pay for their children's testing, even though they never actually paid for the cost of the testing themselves.

¶ 24     Defendants observe that the common law of torts generally does not afford recovery where the injury is merely a failed economic expectation. The prevalent rule at common law is that a plaintiff cannot sue in tort to recover for solely economic loss without any personal injury or property damage. *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 198-99 (1997); *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69, 84 (1982).

¶ 25     Plaintiffs argue that this case is not an "economic loss" case because the damages for the cost of the screenings are not "economic losses" as defined in *Moorman—i.e.*,

          " 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property ***' [citation] as well as 'the diminution in

- 8 -

the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.' [Citation.]" *Moorman*, 91 Ill. 2d at 82.

¶ 26     We deem plaintiffs' argument to be partially correct to the extent that they mean that their tort claim is not automatically barred as a matter of law under the *Moorman* doctrine. This is so, however, not because plaintiffs' claim is not one for purely economic loss. This obviously is a case involving only economic loss, as plaintiffs do not allege any physical injury or property damage and are instead seeking to recover only for the monetary costs of the lead tests.

¶ 27     Rather, as defendants acknowledge, plaintiffs' claim clearly falls within the *Moorman* exception for economic loss cases that allege fraud and intentional misrepresentation. This court has recognized exceptions to the economic loss rule, including where the plaintiff's damages are proximately caused by a defendant's intentional false representation, *i.e.*, fraud. *Id.* at 88-89; *In re Chicago Flood Litigation*, 176 Ill. 2d at 199; *In re Illinois Bell Switching Station Litigation*, 161 Ill. 2d 233, 240-41 (1994). "[T]he tort of fraudulent misrepresentation has been historically treated as purely an economic tort under which one may recover damages for pecuniary harm." *Doe v. Dilling*, 228 Ill. 2d 324, 343 (2008).

¶ 28     In the case at bar, the appellate court correctly recognized that, although count III of plaintiffs' second amended complaint appeared to be a claim for fraudulent concealment, some of the allegations set forth in counts I and II, which were incorporated in count III, might be considered as allegations of fraudulent misrepresentation. *Lewis I*, 342 Ill. App. 3d at 104; see *Stewart v. Thrasher*, 242 Ill. App. 3d 10, 16 (1993) (observing that "a misrepresentation may consist of the concealment of the truth as well as the assertion of what is false"). The appellate court recognized that count VI, the civil conspiracy count, incorporated all of the allegations in the prior five counts. The appellate court acknowledged that counts I through V were properly dismissed for various pleading deficiencies. However, the court held that those counts were sufficient to support a civil conspiracy claim. *Lewis I*, 342 Ill. App. 3d at 107-08. Since the conspiracy count here is grounded on a theory of intentional misrepresentation or fraud, it falls squarely within that exception to *Moorman*'s prohibition of recovering purely economic loss in tort. See

*Moorman*, 91 Ill. 2d at 88-89 (intentional misrepresentation allegations fall within exception).

¶ 29    This court has repeatedly "observe[d] that, because a plaintiff can sustain a cause of action only where he or she has suffered some injury to a legal right, harm caused by the defendant's conduct is an essential element of every cause of action." *Lutkauskas v. Ricker*, 2015 IL 117090, ¶ 31; see *Turcios v. The DeBruler Co.*, 2015 IL 117962, ¶ 27 ("a right of action requires a wrongful act by the defendant and a loss resulting from that act"); *Town of Thornton v. Winterhoff*, 406 Ill. 113, 119 (1950) (to establish "a right of action there must be a wrongful act done and a loss resulting from that wrongful act"). Indeed, courts generally recognize that there must be an actual loss to the interest of the plaintiff before a cause of action accrues. The wrongful or negligent act of the defendant, by itself, gives no right of action to anyone. Until the defendant's wrongful or negligent act produces injury to the plaintiff's interest by way of loss or damage, no cause of action accrues. *Wolfswinkel v. Gesink*, 180 N.W.2d 452, 456 (Iowa 1970); *Rozenfeld v. Medical Protective Co.*, 73 F.3d 154, 155 (7th Cir. 1996) (applying Illinois law) ("A tort does not occur when the tortfeasor violates his duty of care to the victim, but when the tortfeasor injures the victim.").

¶ 30    Specifically in this case, plaintiffs' civil conspiracy claim is grounded in the underlying tortious conduct of intentional misrepresentation, *i.e.*, fraud. In a claim of fraudulent misrepresentation, a plaintiff must establish the following elements: (1) a false statement of material fact (2) known or believed to be false by the person making it, (3) an intent to induce the plaintiff to act, (4) action by the plaintiff in justifiable reliance on the truth of the statement, and (5) damage to the plaintiff resulting from such reliance. *Doe*, 228 Ill. 2d at 342-43 (collecting cases). Courts have long considered an actual injury to be an essential element of fraud, which a plaintiff must establish to a reasonable degree of certainty. *Struve v. Tatge*, 285 Ill. 103, 109 (1918); *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.*, 137 Ill. App. 3d 84, 92 (1985) (in the absence of actual damages, allegations of fraudulent misrepresentation were insufficient to state a cause of action for fraud); *Shah v. Chicago Title & Trust Co.*, 119 Ill. App. 3d 658, 661 (1983) ("Proof of actual injury resulting from the allegedly fraudulent misrepresentations is an essential element of actionable fraud."). Injury is measured by the harm the plaintiff suffered rather than any benefit the defendant received. *Shah*, 119 Ill. App. 3d at

662. "[D]amages may not be predicated on mere speculation, hypothesis, conjecture or whim." (Internal quotation marks omitted.) *Dloogatch v. Brincat*, 396 Ill. App. 3d 842, 851 (2009); *State Security Insurance Co. v. Frank B. Hall & Co.*, 258 Ill. App. 3d 588, 592 (1994) (same). Rather, "the damages necessary to support a cause of action for fraud must be pecuniary in nature." *Cangemi v. Advocate South Suburban Hospital*, 364 Ill. App. 3d 446, 469 (2006).

¶ 31    Accordingly, we hold that plaintiffs were required to establish actual economic loss as an essential element of their claim of intentional misrepresentation. We next address whether plaintiffs satisfied the essential requirement of injury.

¶ 32                          C. Proof of Actual Economic Loss

¶ 33    The circuit court concluded that Lewis and Banks did not suffer, and will not suffer, an out-of-pocket loss as a result of their children's blood screenings. The appellate court did not question this conclusion but nevertheless held that plaintiffs in this case suffered an actual economic loss that satisfies the "injury" requirement for a common-law economic tort claim. The appellate court based its holding on (1) the Family Expense Act (750 ILCS 65/15 (West 2000)) and (2) the collateral source rule. 2018 IL App (1st) 172894, ¶¶ 10-13. Defendants assign error to this holding. We agree with defendants that plaintiffs cannot satisfy the injury requirement to maintain their claim.

¶ 34                              1. Family Expense Act

¶ 35    The appellate court operated under the theory that the Family Expense Act imposed on plaintiffs Lewis and Banks the "obligation" to pay the medical providers for the lead screenings of their children. The court reasoned that, under the Act, "[t]he obligation to pay the medical expenses for a minor child is that of the parent, and, therefore, the cause of action to recover for medical expenses lies in the parent." *Id.* ¶ 10 (citing *In re Estate of Hammond*, 141 Ill. App. 3d 963, 965 (1986)). The court then held that, under the collateral source rule, the parent's right of action "is not affected by the fact that a third party paid those expenses." *Id.* We disagree with the appellate court's reasoning.

¶ 36     The interpretation and applicability of legislation are questions of law appropriate for summary judgment. Our review is *de novo*. *1010 Lake Shore Ass'n*, 2015 IL 118372, ¶ 20; *Allegis Realty Investors v. Novak*, 223 Ill. 2d 318, 330 (2006); *County of Knox ex rel. Masterson v. The Highlands, L.L.C.*, 188 Ill. 2d 546, 551 (1999). The primary objective of statutory construction is to ascertain and give effect to intent of the legislature. The most reliable indicator of legislative intent is the statutory language, given its plain and ordinary meaning. A reasonable construction must be given to each word, clause, and sentence of a statute, and no term should be rendered superfluous. *1010 Lake Shore Ass'n*, 2015 IL 118372, ¶ 21.

¶ 37     The Family Expense Act simply provides that "[t]he expenses of the family and of the education of the children shall be chargeable upon the property of both husband and wife, or of either of them, in favor of creditors therefor, and in relation thereto may be sued jointly or separately." 750 ILCS 65/15 (West 2018). Clearly, the Family Expense Act obligates parents only for "expenses" owed to those persons or entities who have obtained the status of "creditors." The Family Expense Act does not answer the questions of who is a "creditor" or what is an "expense." For those answers, we must look to other sources. The common and ordinary definition of "creditor" is "one to whom money is due." Webster's Third New International Dictionary 533 (1993); see Black's Law Dictionary (11th ed. 2019) ("[o]ne to whom a debt is owed"); see, *e.g.*, *Walradt v. Brown*, 6 Ill. 397, 399 (1844) (the term "creditors," as used in the Statute of Frauds, "means all parties who have demands, accounts, interests or causes of action for which they might recover any debt, damages, penalty or forfeiture").

¶ 38     Here, we find that the medical providers who screened the children of plaintiffs Lewis and Banks were not "creditors" of those plaintiffs within the meaning of the Family Expense Act because plaintiffs never incurred any liability or obligation to pay the providers for their children's tests. The Medicaid program is designed to prevent medical providers from becoming creditors of Medicaid recipients (including parents where the patient receiving service is a child) and to prevent Medicaid recipients from becoming debtors by incurring any obligation to the provider. Illinois regulations require providers to agree, as a condition of participation in Medicaid, to accept the payment they receive from the Department of Healthcare and Family Services as "payment in full" and not to "bill, demand or

otherwise seek reimbursement" from a Medicaid recipient or a relative or representative thereof. See 89 Ill. Adm. Code 140.12(i)(1) (2014). Because plaintiffs never became indebted to the medical providers who conducted the screening, the appellate court erred in concluding that plaintiffs incurred a legal obligation to pay for the screenings.

¶ 39     Plaintiffs also argue that a liability or obligation was created for the additional reason that, even assuming that medical expenses are paid by Medicaid, the State retains a statutory right, pursuant to section 11-22 of the Illinois Public Aid Code (305 ILCS 5/11-22 (West 2018)) to proceed against a Medicaid recipient who recovers for expenses paid by the State for which a third party is liable. Plaintiffs maintain that this "liability," even though contingent, is nevertheless a liability.

¶ 40     We disagree. Section 11-22 of the Public Aid Code does not create any such liability, contingent or otherwise, on the part of Medicaid recipients. Section 11-22 broadly grants the Department of Healthcare and Family Services (DHFS) a "charge upon all claims, demands and causes of action for injuries to" a public aid applicant or recipient. *Id.* The State's right of recoupment is a claim against a wrongdoer and not against the Medicaid recipient. 305 ILCS 5/11-22 (West 2012). Section 11-22a grants DHFS a right of subrogation by intervening or joining an action brought by a recipient against a tortfeasor or by bringing its own action against the tortfeasor. *Id.* § 11-22a. Section 11-22b grants DHFS a lien on any recovery from an underlying tortfeasor. *Id.* § 11-22b(b)(1), (e).

¶ 41     No matter how the State pursues its recoupment rights, whether directly or by way of subrogation, the pertinent provisions of the Public Aid Code only apply to, and are only exercisable against, a judgment *against the wrongdoer*. *Id.* §§ 11-22, 11-22a, 11-22b. Either the State or the recipient can obtain such a judgment. If the State itself does so, as an intervenor or through its own suit (see *id.* § 11-22a), obviously the judgment is not against the recipient. Even if the recipient obtains the judgment (see *id.* § 11-22b(b)(1), (e)), the State's recoupment comes from the *judgment against the wrongdoer* before the net judgment is paid to the recipient, not from the recipient herself. See *Boone v. Evanston Hospital*, 225 Ill. App. 3d 195, 198-99 (1992) (distinguishing the State's and the recipient's rights against the wrongdoer). The statutory scheme created by sections 11-22, 11-22a, and 11-22b of the Public Aid Code complies with the federal mandate not to seek repayment

from the recipients themselves. See 42 U.S.C. § 1396p(b)(1) (2012). Based on this reasoning, the circuit court correctly rejected plaintiffs' argument.

¶ 42    Plaintiffs also rely, as did the appellate court, upon this court's decision in *Graul v. Adrian*, 32 Ill. 2d 345 (1965), to support their claim that plaintiffs became liable for the cost of the lead screening under the Family Expense Act. However, we find that *Graul* has no application here because plaintiffs have made no allegation that their children suffered a physical injury. When a child is injured by a tortfeasor's wrongful act, two causes of action arise—one in favor of the child's parents for the child's medical expenses (including any funeral expenses, if applicable) and another in favor of the child (or the child's estate) for all other categories of damages flowing from the injury. See Restatement (Second) of Torts § 703(b) (1977). *Graul* held that a father could sue for the medical and funeral expenses of his son "incurred by the father as the result of the alleged wrongful act causing the death of his son." 32 Ill. 2d at 346. The father's claim was "based upon an out-of-pocket payment for which there was a legal liability" under the Family Expense Act. *Id.* at 347-48. Where a parent asserts a claim such as that authorized in *Graul* against a tortfeasor who has an injured child, the parent's claim is "derivative in nature, as [it] arise[s] out of the injury to another." *Cullota v. Cullota*, 287 Ill. App. 3d 967, 975 (1997). In other words, the injury that gives both the child and the parent standing to sue in such a case is the physical injury to the child.

¶ 43    In the present case, the appellate court followed its citation to *Graul* with the statement: "The obligation to pay the medical expenses for a minor child is that of the parent, and, therefore, the cause of action to recover for medical expenses lies in the parent." 2018 IL App (1st) 172894, ¶ 10. However, that statement assumes that a cause of action exists and ignores the fact that a cause of action in tort does not arise absent an injury. In a case like *Graul*, the cause of action arises when the child suffers a physical injury. Again, plaintiffs here do not allege a cause of action based on physical injury to their children. They instead claim that defendants caused a pure economic injury personal to Lewis and Banks arising from the costs of their children's tests. But no such economic injury occurred in this case. We hold that the Family Expense Act cannot be extended to create a liability or expense where one never arose and thereby allow a parent to sue an alleged tortfeasor where there was no underlying personal injury claim filed on behalf of the child.

## 2. Collateral Source Rule

The appellate court also held that the collateral source rule applies in a case involving a purely economic injury. *Id.* ¶ 12. We reject the notion that the collateral source rule can be used to satisfy the injury element of plaintiffs' cause of action.

" ' "Under the collateral source rule, benefits received by the injured party from a source wholly independent of, and collateral to, the tortfeasor will not diminish damages otherwise recoverable from the tortfeasor." ' " *Wills*, 229 Ill. 2d at 399 (quoting *Arthur v. Catour*, 216 Ill. 2d 72, 78 (2005), quoting *Wilson v. Hoffman Group, Inc.*, 131 Ill. 2d 308, 320 (1989)). The justification for the rule "is that the wrongdoer should not benefit from the expenditures made by the injured party or take advantage of contracts or other relations that may exist between the injured party and third persons." *Wilson*, 131 Ill. 2d at 320 (citing *Peterson v. Lou Bachrodt Chevrolet Co.*, 76 Ill. 2d 353 (1979)). In *Arthur*, 216 Ill. 2d at 74-75, this court expanded the scope of the rule by holding that a plaintiff could submit the entire amount of billed medical expenses to the jury and was not limited to presenting the amount actually paid to healthcare providers by the plaintiff's insurers. In *Wills*, this court further expanded the collateral source rule by adopting the reasonable-value approach and overruling its prior decision in *Peterson*, which had held that a plaintiff could not recover the value of medical services gratuitously provided because the policies underlying the collateral source rule did not apply when the plaintiff incurred no expense, obligation, or liability in receiving services for which compensation is later sought. *Wills*, 229 Ill. 2d at 400-01, 415; see *Peterson*, 76 Ill. 2d at 363.

The problem with plaintiffs' reliance here upon the collateral source rule is that the rule prescribes the methodology of awarding damages but does not prescribe rules for determining whether plaintiff has suffered an injury. See *Wills*, 229 Ill. 2d at 399-400. We note that the rule has evidentiary and substantive components. *Id.* at 400. As a rule of evidence, it prevents the jury from learning about collateral income. *Id.* And as a substantive rule of damages, it bars a defendant from reducing a plaintiff's compensatory award by the amount the plaintiff received from the collateral source. *Id.* Again, the rule has nothing to do with whether a plaintiff has an actionable injury in the first place.

¶ 48    We further note that none of the underlying rationales for the collateral source rule applies when a plaintiff has suffered no injury. Preventing a plaintiff who has not been injured from recovering money does not confer a "windfall" on the defendant. Nor does a defendant "benefit" from avoiding compensating the plaintiff for a noninjury. In that regard, this case is fundamentally different from our collateral source jurisprudence. *Wills*, for example, involved a personal injury case stemming from an automobile accident. There, we concluded that an "injured plaintiff" is entitled to recover in damages the reasonable value of medical services rendered, even if Medicaid paid for those services. *Id.* at 412-15. In *Arthur*, 216 Ill. 2d at 75, the plaintiff stepped in a hole on the defendant's land and sued the defendant for her personal injuries. And in *Peterson*, 76 Ill. 2d at 356-57, the plaintiff brought a negligence action against the defendant after an allegedly defective braking system in a car sold by the defendant caused an accident that killed his daughter and seriously injured his son, causing the son's leg to be amputated.

¶ 49    The appellate court in the present case framed the issue before it as whether the collateral source rule applies in a case involving a purely economic injury. 2018 IL App (1st) 172894, ¶ 11. But that inquiry put the cart before the horse, as the relevant threshold question was whether plaintiffs could establish an injury at all. The appellate court cited no authority standing for the proposition that the collateral source rule may be invoked to excuse a plaintiff that is asserting an economic tort claim from establishing an injury, and we are not aware of any such authority.

¶ 50    Applying the collateral source rule to pure economic-loss tort cases like the one before us would obscure the very nature of the cause of action. It would allow plaintiffs who have themselves suffered no injury, economic loss, or damages to sue anyway. We observe that such a result cannot be squared with the basic principle of standing that requires "some injury in fact to a legally cognizable interest." See *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492-93 (1988) (also noting that "economic injuries," whether actual or threatened, have long been recognized as sufficient to lay the basis for standing).

¶ 51    Not only have Illinois decisions applied the collateral source rule only where the plaintiffs had established actionable injuries, but decisions in other states have rejected the notion that the collateral source rule may be invoked to establish an

injury. For example, in *Roberts v. BJC Health System*, 391 S.W.3d 433 (Mo. 2013) (*en banc*), a group of patients sued medical providers for fraudulently overbilling them even though the insurers footed the bill. The Missouri Supreme Court held that the collateral source rule was irrelevant in the absence of an injury at all. *Id.* at 439. A federal court addressing the same question agreed, ruling that it found "no authority for the proposition that the [collateral source] rule may operate to confer standing on parties who have suffered no injury in fact." *Roberts v. BJC Health System*, No. 4:04-cv-1556-JCH, slip op. at *9 n.11 (E.D. Mo. Mar. 11, 2005).

¶ 52        Similarly, in *In re Trasylol Products Liability Litigation*, No. 08-MD-01928, 2010 WL 6098571 (S.D. Fla. Mar. 16, 2010), a couple sued a drug manufacturer for unfair and deceptive trade practices, a claim that required a showing of financial loss. The manufacturer moved for summary judgment, arguing that, because the plaintiffs' health insurance covered the cost of the drug, plaintiffs could not prove an essential element of their claim and lacked standing. *Id.* at *15. The district court agreed, holding that the collateral source rule was inapplicable and granting summary judgment for the manufacturer. *Id.* In like fashion, the court in *Gillespie v. Travelscape LLC*, No. C13-0622 RSM, 2014 WL 4243706 (W.D. Wash. Aug. 26, 2014), dismissed a putative class action suit brought by a plaintiff who alleged that a travel company overcharged her for her rooms. The court held the plaintiff lacked standing because her employer reimbursed her for her overcharges. *Id.* at *2-3. In so holding, the court rejected the notion that the collateral source rule saved the plaintiff's claims, finding that the rule was inapplicable where the plaintiff has not suffered any economic loss and thus has no standing. *Id.* at *2. We find this authority persuasive.

¶ 53        In the case at bar, plaintiffs' claim of intentional misrepresentation is a tort involving a pure economic-related loss. As we earlier discussed, in economic tort cases, dollars are not just damages, they *are* the claim itself. See *Cangemi*, 364 Ill. App. 3d at 469; *Charles Hester Enterprises*, 137 Ill. App. 3d at 92; *Shah*, 119 Ill. App. 3d at 661. If plaintiffs cannot prove economic injury, that is, if plaintiffs have incurred no economic loss due to defendants' conduct, they have no claim at all.

¶ 54        A cause of action for civil conspiracy exists only if one of the parties to the agreement commits a tort in furtherance of the agreement. *Adcock*, 164 Ill. 2d at 63. Therefore, in the case at bar, because plaintiffs failed to prove the existence of

the underlying tort action, they cannot prove the existence of a conspiracy to commit that tort. See, *e.g.*, *Davis v. Times Mirror Magazines, Inc.*, 297 Ill. App. 3d 488, 499 (1998); *Langer v. Becker*, 176 Ill. App. 3d 745, 754-55 (1988); *Illinois Traffic Court Driver Improvement Educational Foundation v. Peoria Journal Star, Inc.*, 144 Ill. App. 3d 555, 563 (1986). Since "parents or legal guardians who incurred no expense, obligation or liability for lead toxicity testing of their children" are expressly excluded from the class, plaintiffs also lack standing.

¶ 55                                III. CONCLUSION

¶ 56        In sum, we hold as follows. Plaintiffs did not incur any liability and did not suffer any actual economic loss in this case. Accordingly, plaintiffs did not suffer any injury that would satisfy the essential element of injury in their underlying economic tort claim of intentional misrepresentation. Consequently, plaintiffs cannot prove the existence of a conspiracy to commit that tort. Thus, the circuit court properly granted summary judgment in favor of defendants. Therefore, we reverse the judgment of the appellate court, which reversed the circuit court's order granting summary judgment for defendants, and we remand the cause to the circuit court of Cook County for further proceedings consistent with this opinion.

¶ 57        Appellate court judgment reversed.

¶ 58        Circuit court judgment affirmed.

¶ 59        Cause remanded.

¶ 60        JUSTICES KILBRIDE and MICHAEL J. BURKE took no part in the consideration or decision of this case.