2025 IL App (1st) 240638-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FIRST DIVISION
January 27, 2025

No. 1-24-0638

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| BOARD OF DIRECTORS OF 1212 LAKE SHORE DRIVE CONDOMINIUM ASSOCIATION, an Illinois not-for-profit corporation, | ) ) ) | |
| | ) | Appeal from the |
| Plaintiff and Counter-defendant/ Appellee, | ) ) | Circuit Court of Cook County |
| | ) | |
| v. | ) | No. 19 CH 12665 |
| | ) | |
| DAVID J. LIST, an individual, and LESLIE M. LIST, an individual, | ) ) ) | The Honorable Patrick J. Sherlock, Judge Presiding. |
| Defendants and Counter-plaintiffs, | ) | |
| | ) | |
| (David J. List, Defendant and Counter-plaintiff/ Appellant). | ) ) | |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Pucinski and Cobbs concurred in the judgment.

**ORDER**

¶ 1     *Held:*   The appellate court reverses the trial court's granting of summary judgment in favor of a condominium association where genuine issues of material fact exist as to the value of the unit owner's damages from water infiltration. The court holds that the collateral source rule does not bar the condominium association from later obtaining a setoff of amounts that the unit owner received from his property insurer in compensation for the same losses.

¶ 2     The defendant/counter-plaintiff, David J. List (List), appeals from the trial court's entry of

summary judgment against him and in favor of the plaintiff/counter-defendant, the Board of Directors of 1212 Lake Shore Drive Condominium Association (Association), on all three counts of List's first amended counterclaim alleging breach of contract, breach of fiduciary duty, and constructive fraud. Based on our conclusion that the Association could not enforce its right to setoff at the summary judgment stage and the existence of genuine issues of material fact as to damages, we reverse and remand for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4        In July 2014, David and Leslie List[1] purchased a penthouse unit on the 34th floor of a condominium building at 1212 North Lake Shore Drive in Chicago. The unit they purchased is located partially below the building's swimming pool on the 35th floor. The present dispute arises from a series of incidents in which water infiltrated the Lists' unit and caused damage to the ceiling and other property inside it. The summary judgment record indicates that this began in about October or November 2014, when the Lists noticed water coming out of a wall outlet in a bathroom. Efforts to identify the water's source were unsuccessful. On June 15, 2015, a catastrophic event occurred in which a large section of the ceiling in the Lists' bedroom collapsed due to water from above, which also led to the unit experiencing significant flooding.

¶ 5        The events above led to multiple insurance claims being submitted and paid. The Association submitted a claim through its master condominium insurance policy, which was apparently issued by Admiral Indemnity Company. List testified that in early 2017, he received a payment of slightly over $27,000 as a result of this claim. He testified that this payment was based on "a quote to repair the ceiling, walls, in the disaster area *** [and] also included doors and trim."

_____

[1] In the trial court proceedings, Leslie List was also a defendant/counter-plaintiff. However, this appeal is not pursued on her behalf.

¶ 6      Separately, the Lists submitted a claim through the homeowners' insurance that they maintained on the unit, which was through Liberty Mutual. List testified that as a result of this claim, over a period of years he received approximately $218,000 for property damage and $20,000 for loss of use, which was all related to the incident of June 15, 2015. Additionally, List testified that he received a payment of approximately $16,000, for loss of use only, relating to the incident of November 2014.

¶ 7      While the summary judgment record is less than clear as to various points, we discern from its aspects most favorable to the nonmovants that despite the above insurance payments, some part of the ceiling of the Lists' unit was not replaced for over six years following its collapse in June 2015. The remainder of the ceiling in the bedroom that had not previously collapsed was taken down at some point, but List could not remember when that occurred. At first, this stemmed from the Lists' desire to replace the ceiling in connection with a broader renovation that they envisioned for their unit. As time progressed, however, they continued to notice water coming into their unit from some source in the common elements above. List testified that this occurred in the 2018-2019 timeframe, when he noticed "various like small leaks" in the foyer, the kitchen, the front hall, the second bedroom, and the second bathroom. List described some of these leaks as "maybe a puddle of water on the floor," while others were long "rusty drips coming out of *** what I believe was a roof drain pipe" near the front hall and living room. These continued leaks made the Lists apprehensive about undertaking renovation work due to their uncertainty that the problems with water leaking from the common elements above had been adequately remedied by contractors hired by the Association.

¶ 8      The evidence showed that following the ceiling collapse in June 2015, the Lists continued to reside in their unit until about January or February 2017. At that time, they stopped staying there

"because it sucked" and instead began staying exclusively at a second residence they owned in the suburbs. In about November 2017, they moved back into the building at 1212 North Lake Shore Drive; however, instead of returning to the unit at issue, they rented a different unit in the same building. They did so with the plan of living nearby as renovation work commenced in the unit they owned. At the end of 2017, they started demolition work on their unit. However, the evidence suggests that the reason renovation work did not commence following demolition was the continuance of water leaks into the unit in 2018-2019 and efforts by the Association's contractors to identify their source and to remediate them. The Lists testified that the Association reimbursed them $4500 or $5000 per month for at least some portion of the 2018-2019 timeframe while they were displaced from the unit they owned.

¶ 9        Around March 2019, the Association informed the Lists that work on the pipes, drains, valves, and other common element equipment above their unit had been completed and that it intended to proceed to restore the damaged common-element walls and ceilings around the Lists' unit. A dispute apparently arose at this point about whether this work would be performed by a contractor selected by the Association or a contractor selected by the Lists. Then, in June 2019, mold was discovered in the Lists' unit, which the Association agreed to remediate at its expense.

¶ 10        The present litigation commenced on October 30, 2019, when the Association filed an action for injunctive relief. It alleged that the Lists were improperly denying its contractors access to their unit to perform repair and restoration work to the common element walls and ceilings and to perform the requisite mold remediation work. In turn, the Lists filed a counterclaim, the first amended version of which alleges generally that the Association breached its contract (*i.e.*, the governing declaration of condominium), breached its fiduciary duty, and engaged in constructive fraud by failing to adequately maintain and repair the common element plumbing and equipment

above their unit to ensure that it would not continue to experience water infiltration. The Association filed various affirmative defenses to the Lists' first amended counterclaim, including that they failed to mitigate their damages and that they had comparative fault for those damages.

¶ 11    On May 31, 2021, the trial court held a settlement conference that resulted in an agreement whereby the trial court authorized and ordered the Association to perform the mold remediation work in the Lists' unit and to perform the repair and restoration work on the common element walls and ceilings of the Lists' unit. That work was completed in 2021, and the case was eventually transferred to the law division on the Lists' counterclaim for money damages. The case proceeded to discovery on the counterclaim and was eventually set for jury trial beginning February 26, 2024.

¶ 12    On December 8, 2023, following completion of discovery, the Association filed a motion for summary judgment in which it asserted that the Lists had no recoverable damages on their counterclaims. This motion had two primary aspects. First, the Association argued that it was entitled to a setoff for the over $250,000 that the Lists had previously received from Liberty Mutual for their property damage and for other repairs already completed by the Association. It argued that the Lists would receive a double recovery if they recovered damages from the Association for the same losses for which they had previously received payment. It argued that the collateral source rule did not apply here, as the Lists were required to maintain insurance on their unit under the condominium's governing declaration, and Liberty Mutual had no right of subrogation.

¶ 13    Second, the Association argued that Lists' evidence was insufficient to prove that they had any present damages for which the Association was responsible. It argued that the last known water leak had occurred in about October 2018, and the Lists' expert had testified he was unaware of any active leaks or other hazards that existed above their unit. It further argued that the Lists had no legal right to obtain money damages for equipment above their unit that was potentially

unrepaired but belonged to the Association as a common element (*i.e.*, abandoned pipes, removal of asbestos insulation around pipes and the pool, floor drains, or a spalled concrete pad above the unit). Finally, the Association argued that a leasing restriction barred any claim by the Lists for lost rental income.

¶ 14        The Lists filed a response to the Association's motion for summary judgment. First, they contended that the collateral source rule did apply in this case, the effect of which was to prevent the Association from obtaining a setoff of any recovery the Lists had previously received from Liberty Mutual for their property damage losses from the amount of damages for which the Association was liable.

¶ 15        Second, the Lists argued that genuine issues of material fact existed as to the nature and extent of damages they had sustained as a result of the Association's failure to maintain the common elements above their unit. They cited evidence showing that their unit had sustained property damage due to leaks in the common elements above it in October 2014, June 2015, and a series of occasions in 2018-2019. They argued that their damages from these events remained ongoing, because their unit "has remained uninhabitable since the 2015 ceiling collapse." They asserted that in March 2019, they received an estimate of $400,000 for "construction repairs to renovate and return the Unit [to] a habitable condition." They also cited evidence that they had incurred costs of $5000 to obtain alternative housing in the building for an extended period of time following the ceiling collapse. And they argued that the Association's repair efforts in 2021 needed to be redone because the unit has exposed electrical conduits, electrical outlets covered by drywall, water damaged light fixtures, and loose HVAC ducts. The Lists disputed the Association's assertion that the damages they were seeking were for unrepaired common elements or lost rental income. Instead, they contended that they were entitled to damages for loss of use or enjoyment of their

unit resulting both from its uninhabitability and the Association's refusal to conduct a comprehensive investigation of the common elements above it despite years of water leaks.

¶ 16    The trial court granted the Association's motion for summary judgment. First, it reasoned that the Lists would receive an impermissible double recovery if they were allowed to obtain damages from the Association for those losses for which they had already been reimbursed approximately $254,000 by Liberty Mutual. It noted also that they had received over $27,000 from the Association's insurer to repair their ceiling in 2017 and that the Association later undertook this work anyway in 2021. It found the collateral source rule inapplicable because the Association's declaration required the Lists to carry insurance and prevented subrogation claims.

¶ 17    Second, the trial court reasoned that this was a " '*Celotex*-type motion' " for summary judgment to which the Lists had failed to respond with admissible evidence to the Association's assertion that it had no recoverable damages. See *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The trial court stated that despite the Lists' recitation of the history of leaks and attempts at repairs, they provided no admissible evidence to prove any damages not previously repaired or paid for by the Association. It noted that they had no evidence that any active leak continued to exist above their unit. It reasoned that the Lists had not presented admissible evidence that the unit was uninhabitable following the drywall repairs in 2021, as one of their experts giving this opinion was an attorney with no expertise in construction, and a report to this effect, which was appended to their response to the motion for summary judgment, was by witness not disclosed to testify at trial. The trial court further found that the Lists' damages were not shown by the March 2019 estimate of $400,000 to restore the unit, as it was also prepared by a witness not disclosed to testify at trial and failed to distinguish between necessary repairs and elective renovation work.

¶ 18    Finally, the trial court stated that the Lists lacked standing to seek damages for unrepaired

common elements above them and that a rental restriction in the declaration prevented them from recovering damages for lost rental amounts. It did not reference the Lists' argument that they were entitled to pursue damages for loss of use or enjoyment of their unit. This appeal followed.

¶ 19                                    II. ANALYSIS

¶ 20        List argues on appeal that the trial court erred by granting the motion for summary judgment in favor of the Association. The granting of a motion for summary judgment is a ruling that we review *de novo*. *Lewis v. Lead Industries Ass'n*, 2020 IL 124107, ¶ 15. It is properly granted when the pleadings, depositions, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2022). The purpose of summary judgment is not to try a question of fact but, rather, to determine whether a genuine issue of material fact exists. *Lewis*, 2020 IL 124107, ¶ 14. In determining whether a genuine issue of material fact exists, we construe the evidence in the record strictly against the movant and liberally in favor of the party opposing summary judgment. *Id.* ¶ 15. A genuine issue of material fact exists and precludes summary judgment where material facts are disputed or, if the material facts are undisputed, reasonable persons might draw different inferences from them. *Id.* Although summary judgment can aid in the expeditious disposition of a lawsuit, it remains a drastic means of disposing of litigation and should be allowed only where the right of the moving party is clear and free from doubt. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008).

¶ 21        In a summary judgment proceeding, the burden of persuasion remains always on the moving party to establish that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Performance Food Group Co. v. ARBA Care Center of Bloomington, LLC*, 2017 IL App (3d) 160348, ¶ 18. Where the moving party is a defendant, it

bears the initial burden of production to affirmatively establish through its pleadings and supporting evidence that some element of the case must be resolved in its favor or that there is an absence of evidence to support the plaintiff's case. *Id.* (citing *Direct Auto Insurance Co. v. Beltran*, 2013 IL App (1st) 121128, ¶ 43). Only if the defendant satisfies this initial burden of introducing competent evidence that, if contradicted, entitles it to judgment as a matter of law does the burden shift to the non-moving plaintiff to present some factual basis that would arguably entitle the plaintiff to judgment at trial. *Willett v. Cessna Aircraft Co.*, 366 Ill. App. 3d 360, 369 (2006).

¶ 22    In this appeal, List's primary argument is that the evidence demonstrates that genuine issues of material fact exist as to whether, and the extent to which, he and his wife suffered damages caused by the Association's failure to repair and maintain the common elements above their unit that caused water to leak into it over a course of many years. While List argues that the collateral source rule applies here to prevent the Association from claiming any setoff of insurance payments he received from Liberty Mutual, he argues that even if that rule is inapplicable, the evidence shows a genuine issue of material fact as to whether the value of the Lists' damages exceeds the amount of insurance proceeds they received.

¶ 23    Addressing the arguments raised by List requires us to first address the unusual nature of the argument by the Association that gave rise to summary judgment. Properly characterized, the Association was not arguing here that the Lists had no legal damages whatsoever caused by the water that entered their unit from the common elements above it. Instead, a more accurate characterization of the Association's argument is that it could never become financially liable to pay "new money" in a judgment due to its right to a setoff of the insurance payments that the Lists had previously received from Liberty Mutual, along with the repairs that the Association has previously paid for or completed.

¶ 24    This argument by the Association is based upon the well-established rule that a plaintiff may receive only one full compensation for his or her injuries, and double recovery for the same loss or injury is not allowed. *Thornton v. Garcini*, 237 Ill. 2d 100, 111 (2010). As applied in contract cases, this rule stems from the principle that the purpose of compensatory contract damages is to place the nonbreaching party in the position he would have occupied had the contract been performed, not to place him in a better position or to provide him with a windfall recovery. *Federal Insurance Co. v. Binney & Smith, Inc.*, 393 Ill. App. 3d 277, 296 (2009). To avoid such a windfall or double recovery, defendants are generally entitled to a setoff or reduction in damages of those amounts that the plaintiff has already collected from other sources in compensation for the same loss. See *Stendera v. State Farm Fire & Casualty Co.*, 2012 IL App (1st) 111462, ¶¶ 19-20.

¶ 25    However, issues involving the amount by which a defendant may set off or reduce its damages due to a plaintiff's receipt of payments from a third party in compensation for the same injury are generally decided following a trial, not on summary judgment. See e.g., *Thornton*, 237 Ill. 2d at 106 (setoff sought by posttrial motion); *Philippou Eye Associates, Ltd. v. Pill*, 2022 IL App (2d) 210324, ¶ 25 (same); *cf. Stendera*, 2012 IL App (1st) 111462, ¶¶ 13, 25-26 (where parties filed cross-motions for summary judgment on issue of insurer's entitlement to setoff, issues of fact about value of plaintiffs' damages prevented determination that insurer was entitled to setoff in excess of any damages). The reason for this is that, without a trial at which a factfinder can determine what the evidence shows to be the plaintiff's losses from the defendant's conduct and the amount necessary to compensate the plaintiff for those losses, a court cannot make a judicial determination that a plaintiff has obtained a double recovery for a particular loss or injury. See *In re Salmonella Litigation*, 249 Ill. App. 3d 173, 183 (1993) ("[w]ithout a determination following full litigation of a tort case of the amount necessary to fully compensate claimants for their injuries,

this court cannot say that any amount constitutes a double recovery"); *Stendera*, 2012 IL App (1st) 111462, ¶ 26 ("[w]hether or not the plaintiffs actually spent more than the [cost of repairs] claimed by defendant is a genuine issue of material fact precluding summary judgment, as that figure must be determined to conclude whether or not plaintiffs have received a windfall"). Further, a motion seeking this form of setoff or reduction of damages is considered a means of satisfying a judgment and thus "in the nature of a supplementary or enforcement proceeding." *Star Charters v. Figueroa*, 192 Ill. 2d 47, 48-49 (2000).

¶ 26        We find in this case that the Association was not entitled to summary judgment based upon its right to a setoff of amounts received by the Lists from Liberty Mutual. While it may turn out to be the case that the Lists have already received full compensation for every loss caused by the Association's conduct in this case, this is not a question we can determine on summary judgment as a matter of law or undisputed fact. The record indicates that the Lists intended at trial to seek compensatory damages for the property damage to their condominium unit, loss of use and enjoyment of it, diminution in its value, loss of personal property, and amounts they paid to secure alternative housing and related expenses. Assuming for argument's sake that each of these categories of damages applies here, a trial is required to determine the value of these damages and precisely what losses were caused by the Association's conduct at issue. Until that occurs, a court cannot determine whether the Association is financially responsible for any losses for which the Lists have not previously received compensation.

¶ 27        Despite the fact that the amount of setoff cannot be determined prior to trial, we recognize that it will materially advance this litigation for us to proceed to consider whether the trial court was correct in ruling that the collateral source rule did not apply in this case to bar any setoff by the Association of amounts the Lists received from Liberty Mutual. List argues that the trial court

- 11 -

erred in concluding that the collateral source rule did not apply in this context. Neither party contends that any issue of fact exists as to this issue, and the applicability of the collateral source rule is a question of law subject to *de novo* review. *Arthur v. Catour*, 216 Ill. 2d 72, 78 (2005).

¶ 28    The collateral source rule is a doctrine generally applied in tort cases. *Otto Baum Co. v. Süd Family Limited Partnership*, 2020 IL App (3d) 190054, ¶ 26. The rule provides that "benefits received by the injured party from a source wholly independent of, and collateral to, the tortfeasor will not diminish the damages otherwise recoverable from the tortfeasor." *Wilson v. Hoffman Group, Inc.*, 131 Ill. 2d 308, 320 (1989). Its most common application is when some or all of an injured plaintiff's medical expenses have been paid or satisfied through insurance coverage that the plaintiff alone procured; in such instance, damages recoverable from the tortfeasor are not decreased by the value of the insurance proceeds that the plaintiff received. See *id.*; *Arthur*, 216 Ill. 2d at 79. The justification for this rule is that the wrongdoer should not benefit from expenditures made by the injured party or take advantage of contracts or other relationships that may exist between the injured party and third persons. *Wilson*, 131 Ill. 2d at 320.

¶ 29    As a substantive rule of damages, the collateral source rule bars a defendant from setting off or reducing a plaintiff's compensatory award by the amount the plaintiff received from a collateral source. *Wills v. Foster*, 229 Ill. 2d 393, 400 (2008). It has thus been described as an " 'established exception to the general rule that damages in negligence actions must be compensatory.' " *Id.* at 399 (quoting 25 C.J.S. *Damages* § 172 (2002)). Nevertheless, the injured party generally does not receive a double recovery because of lien or subrogation rights that exist in favor of the collateral source that provided benefits to the plaintiff. *Wills*, 229 Ill. 2d at 399. The existence of such subrogation or lien rights in favor of the collateral source is another justification for application of the collateral source rule. *Morse v. Donati*, 2019 IL App (2d) 180328, ¶ 21; see also Joseph M.

Perillo, *The Collateral Source Rule in Contract Cases*, 46 San Diego L. Rev. 705, 719-20 (2009).

¶ 30    The parties here cite and discuss a statement found in several Illinois cases that the collateral source rule "applies in contract cases only where there is an element of fraud, tort, or willful and wanton conduct." *Otto Baum Co.*, 2020 IL App (3d) 190054, ¶ 26; see also *American Fidelity Fire Insurance Co. v. General Ry. Signal Co.*, 184 Ill. App. 3d 601, 617 (1989); *Jiles v. Spratt*, 195 Ill. App. 3d 354, 358 (1990) (paternity case). We do not find this to be a particularly clear or helpful rule for analyzing whether the collateral source rule should be applied here. However, we accept that this case can be said to involve a tort-like breach of contract, inasmuch as it involves property damage caused by the alleged breach of a contractual duty to maintain property.

¶ 31    We believe the more appropriate considerations in this case are the relationship of the parties to each other and to Liberty Mutual and whether the parties' have spoken by contract to this issue. In other words, our primary consideration is whether, in this context involving condominium property and insurance, Liberty Mutual is a "source wholly independent of, and collateral to" the Association. See *Wilson*, 131 Ill. 2d at 320. The Association argues that Liberty Mutual is not a collateral source in this context because the Lists were required by the Association's governing declaration and rules to maintain homeowners' insurance on their unit. The Association further argues that the declaration contains a waiver of subrogation provision that demonstrates an intent by the parties to shift risks of loss to their respective insurance carriers and to prevent double recovery by unit owners.

¶ 32    We note that condominium declarations are regarded as contracts between condominium associations and their constituent unit owners that govern the administration of the condominium property. See *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2014 IL App (1st) 111290, ¶ 75. Here, the Association relies primarily on a provision of the governing declaration that states:

"Each Owner shall be responsible for his own insurance on his personal property in his own Unit, his personal property stored elsewhere on the Property and his personal liability to the extent not covered by the liability insurance for all the Owners obtained by the Board as hereinafter provided."

The Association also relies on a provision contained in the Association's "Resident's Handbook," which the Association refers to as a "rule." That provision states in pertinent part:

"The Board of Managers maintains insurance on the building and the common elements for damage, destruction, liability and other purposes. The premiums are included in the monthly assessment. The all-risk policy on the building guarantees replacement of any unit. The policy, however, does not cover the contents of that unit, such as improvements, furnishings or clothing. The policy also does not cover any liability for accident occurring within a unit.

For these reasons, each unit owner is required to carry an individual condominium owner's policy with a minimum of $500,000 liability coverage for personal and compensatory damages resulting from property damage caused to another unit that originates in the insured's unit. ***

In general, unit owners or residents should consult their personal insurance advisors for advice on insurance matters. However, the coverage of any unit owner policy should be coordinated with the overall Association policies to ensure full coverage."

Regarding waiver of subrogation, the Association cites to a provision of the declaration which states:

"Property and general liability policies required to be carried by the Association must include each of the following provisions:

- 14 -

* * *

> (c) The Unit Owner waives his or her right to subrogation under the Association policy against the Association and the Board."

We note also that this provision concerning subrogation essentially tracks the language of section 12(e) of the Condominium Property Act (765 ILCS 605/12(e) (West 2022)).

¶ 33   For his part, List argues that Liberty Mutual is a collateral source in this context. List primarily takes issue with the assertion by the Association that it *requires* him to obtain insurance covering property damage to his individual unit. He argues that the provision of the declarations primarily relied upon by the Association, as set forth above, does not *require* a unit owner to obtain insurance for personal property. Rather, List argues, the cited provision is merely a non-mandatory advisory or warning to unit owners that they are responsible for their own insurance on the property in their units that is not covered by the Association's insurance. List also draws a contrast with a different provision of the declaration that expressly authorizes the Association to require unit owners to obtain personal *liability* insurance to other unit owners:

> "The Board may require condominium Unit Owners to obtain insurance covering their personal liability and compensatory (but not consequential) damages to another Unit caused by the negligence of the Unit Owner or his or her guests, residents, or invitees, or regardless of any negligence originating from the Unit. The personal liability of a Unit Owner or Association member must include the deductible of the Unit Owner whose unit was damaged, any damage not covered by insurance required by this subsection, as well as the decorating, painting, wall and floor coverings, trim, appliances, equipment, and other furnishings."

(We note also that this provision essentially tracks the language of section 12(h) of the

Condominium Property Act. *Id.* § 12(h).) Accordingly, List argues that liability coverage is the only insurance that the Association may require under this provision. He similarly argues that the above-cited provision of the Resident's Handbook requires only liability insurance for damage caused to another unit. He contends that nothing required him as a unit owner to obtain coverage for damage to personal property within his unit.

¶ 34    We do not find List's arguments to be persuasive that the controlling factor as to whether Liberty Mutual is a "collateral" source in this context is whether property coverage for individual unit owners is mandatory or optional. Even if, as List contends, the declaration here contains only a non-mandatory warning advising unit owners to obtain such coverage, it is nevertheless clear that part of the intent behind such coverage is to secure a benefit to the condominium association of which the unit owner is part. After all, a condominium association is merely the totality of the unit owners who also share an undivided interest in the condominium's common elements. See *Board of Directors of 175 East Delaware Place Homeowners Ass'n v. Hinojosa*, 287 Ill. App. 3d 886, 889 (1997). The physical proximity and interdependence of the units of a condominium make it foreseeable that events such as water damage or fire will occasionally occur from a source in another unit or, as here, in the common elements. We find that the provisions of the declaration set forth above demonstrate an overall intent to shift the risk of loss from such events to insurance, thereby lessening the likelihood that the condominium association or its constituent unit owners will become engaged in disputes or litigation with one another. Individual unit property damage coverage serves exactly this purpose. It shifts the risk of loss away from the condominium association and other unit owners to insurance and better allocates risk depending on the extent of renovations within a unit or the value of property kept inside it. Such coverage thus serves both to keep the peace among neighbors with mutual interests in the condominium property and to

preserve the collective resources of the condominium association. It is thus not coverage "wholly independent of, and collateral to" the Association in this context.

¶ 35    Because we conclude that Liberty Mutual is not a collateral source here, we agree with the trial court that the collateral source rule does not apply in this case. Furthermore, while the parties dispute whether Liberty Mutual hypothetically could pursue subrogation under the language of the declaration, there is nevertheless no suggestion that Liberty Mutual is actually asserting any form of subrogation rights in this case. The absence of any actual assertion of subrogation rights by Liberty Mutual is an additional factor that supports of our conclusion that the collateral source rule does not apply here, as it makes the possibility of an impermissible double recovery more likely. See Perillo, *The Collateral Source Rule in Contract Cases*, 46 San Diego L. Rev. at 719-20 ("The presence of the possibility of subrogation is often critical to the application of the collateral source rule. If the collateral source will be subrogated for its payment to the plaintiff, this fact provides a secure basis for application of the collateral source rule" and "rebuts any argument that the plaintiff will reap the reward of a double recovery."); accord *Wills*, 229 Ill. 2d at 399 (subrogation generally precludes double recovery in cases where the collateral source rule applies).

¶ 36    Finally, we recognize that List raises several additional arguments pertaining to the elements of recoverable damages in this case and to specific statements in the trial court's ruling about the competency of evidence that he submitted in opposition to summary judgment. We deem it inappropriate to resolve these arguments on review of summary judgment, given that we are remanding this case for trial. Each of these arguments involves issues going to the admissibility of evidence, disclosure of witness testimony, and jury instructions that are appropriate for determination in the context of trial. We further deny List's request that we order this case reassigned to a different trial judge upon remand.

¶ 37                                    III. CONCLUSION

¶ 38        For the foregoing reasons, we reverse the order of the trial court granting the motion for summary judgment in favor of the Association and remand this case for further proceedings consistent with this decision.

¶ 39        Reversed and remanded.