2023 IL App (1st) 211115-U
No. 1-21-1115

FIRST DIVISION
May 1, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

---

| | | |
|---|---|---|
| MICHAEL C. KIM, doing business as MICHAEL C. KIM & ASSOCIATES, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff and Counterdefendant Appellee, | ) ) | |
| v. | ) ) | No. 13 M1 131645 |
| HEMINGWAY HOUSE CONDOMINIUM ASSOCIATION, an Illinois not-for-profit corporation, | ) ) ) | |
| Defendant and Counterplaintiff-Appellant. | ) ) | Honorable Daniel J. Kubasiak, |
| (Klein & Hoffman, Inc., Counterdefendant) | ) | Judge, presiding. |

---

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Lavin and Justice Coghlan concurred in the judgment.

## ORDER

¶ 1    *Held*:    The trial court properly granted summary judgment to a condominium association's former attorney dismissing all counterclaims against the attorney. The condominium association could not establish that it was injured merely because the former attorney assisted the association's prior board of directors in implementing a façade repair option that was more expensive than the option preferred by the current board, where it is undisputed that the more expensive repair program was more comprehensive and expected to last longer than the cheaper option.

¶ 2       Defendant-appellant and counterplaintiff Hemingway House Condominium Association (HHCA) appeals from the trial court's entry summary judgment in favor of plaintiff and counterdefendant Michael C. Kim, doing business as Michael C. Kim & Associates (Kim), dismissing each of the counts contained HHCA's counterclaim against Kim. HHCA also appeals from the denial of its motion for partial summary judgment against Kim.

¶ 3       For the reasons that follow, we affirm the entry of summary judgment for Kim because HHCA cannot establish an injury to support any of the counts of its counterclaim against Kim. In light of that determination, we need not reach the merits of HHCA's motion for partial summary judgment against Kim.

¶ 4       BACKGROUND

¶ 5       This appeal arises from a dispute among condominium owners as to how to remedy water intrusion at the Hemingway House Condominiums, a 29-story building in Chicago.[1] HHCA is charged with the operation and management of the 280 units in the building. HHCA is governed by a board of directors (the Board), pursuant to the HHCA's "Declaration of Condominium Ownership, Easements, Restrictions, Covenants, and Bylaws" (Declaration). Significantly, the Board membership changed substantially as of 2012, apparently due to the dispute herein regarding which option should be implemented to address the water intrusion.

¶ 6       Plaintiff-appellee Kim, an attorney, formerly served as HHCA's attorney and worked with the Board with respect to efforts to remediate the water intrusion and related litigation matters. As alleged by HHCA, Kim assisted former members of the Board (the Prior Board) in causing the

_____

[1] The instant dispute was the subject of a prior order of this court issued in June 2020. *Kim v. Hemingway House Condominium Ass'n*, 2020 IL App (1st) 190603-U (June 16, 2020).

HHCA to adopt a costly repair program and a related special assessment, contrary to the interests and wishes of the HHCA and unit owners. After the membership of the Board changed in 2012, the New Board terminated Kim's representation of HHCA.

¶ 7 **The Water Intrusion Problem and the 2011 BTC Report**

¶ 8 The record reflects that the building was constructed in 1969 and that its exterior consists of exposed concrete, brick masonry, and aluminum frame windows. Beginning in the 2000s, certain units began to experience water intrusion, apparently resulting from defects in the building's exterior walls.

¶ 9 The record reflects that HHCA contracted with Building Technology Consultants, PC (BTC) to perform a "water leakage and façade evaluation", resulting in a report issued in January 2011. That report described cracking in numerous bricks, cracked and deteriorated mortar joints, cracking concrete beneath windows. BTC's report described a number of "alternative repair options." BTC stated that the "long-term and most robust solution would be to remove the existing brick veneer in its entirety *** and re-construct the veneer with new brick, new TWF [through-wall-flashing], and a proper water management system." BTC noted that this was "likely to be one of the most long-term solutions" but would "by far have the highest initial cost," with an estimated cost of $6 million. However, BTC stated that the most expensive option will result in "lower future maintenance and repair requirements." BTC indicated that less expensive options would include "conventional masonry and concrete repairs" or, "localized" repairs at areas with water leakage.

¶ 10 **Kim Advises the Association Regarding Implementation of a Special Assessment**

¶ 11 The record reflects that the Prior Board requested Kim's legal advice as to the steps the Board could take to address the water intrusion problem and a related special assessment. The

record contains an August 2011 letter from Kim addressed to the building property manager, advising that "the Board of Directors alone can make the decision to repair [the] building face and to replace the windows." In that letter, Kim noted that the adoption of a special assessment "is governed by Section 18(a)(8) of the [Condominium Property] Act" and that there are "three situations regarding special assessments:

> (1) If the special assessment is required due to an emergency *** or due to a legal mandate (for example, to correct a building code violation), then the Board alone has the authority to adopt the special assessment in any amount required, without any approval of the unit owners;
>
> (2) If the assessment is for additions or alterations to common elements which are not included in the current annual budget, then that special assessment requires approval of at least two-thirds of the unit owners in accordance with their percentages of ownership interest; and
>
> (3) In all other circumstances, if the adoption of the special assessment will result in the sum of all regular and special assessments payable in the current fiscal year exceeding 115% of the sum of all regular and special assessments payable during the preceding fiscal year, then upon delivery of a written petition signed by unit owners *** the Board must call a meeting of the unit owners within 30 days at which the unit owners will vote on that special assessment (and unless a

majority of the total votes of all unit owns is cast to reject the special assessment, the special assessment will be deemed ratified)."

¶ 12    Kim further advised in the same letter to the property manager:

"In our prior discussion, you indicated that Situation 1 would not apply because there are no emergency or legal violations currently presented by this situation. It would seem that Situation 2 can and should be avoided if there are no additions or alterations being made to the common elements, but instead the project involves only façade repair and window replacement (that is, work on existing common elements). Thus, Situation 3 would be applicable. Assuming that the special assessment (estimated to be in the range of $6 to $7 million dollars) will result in a greater than 15% increase in the current total assessments *** then there is a potential for a referendum vote being called *** however, if a majority of the unit owners (by percentage of ownership interest) would support the special assessment, then ultimately that special assessment will be ratified."

¶ 13    **Engagement of K&H and the 2012 K&H Report**

¶ 14    The Prior Board separately engaged an engineering firm, Klein & Hoffman, Inc. (K&H), regarding to the water intrusion. On November 30, 2011, K&H submitted to HCAA a proposal to inspect the building, suggest options to address the water infiltration, and discuss the various advantages and disadvantages of each option. K&H inspected the building and issued a

corresponding report dated February 28, 2012, K&H's report set forth five repair options, although the instant appeal focuses on whether the less expensive "Option 1" or the more costly "Option 2" should have been implemented.

¶ 15    As described by K&H, "Option 1" involved "Conventional Masonry Repairs" including repair of the existing brick masonry and deteriorated concrete. K&H's report explained:

> "This option has the lowest initial cost and will help to alleviate some of the current water infiltration issues. It will not eliminate the water infiltration problems. Water infiltration will reoccur in the future. Additional maintenance and water infiltration repairs are anticipated in the future."

¶ 16    K&H's "Option 2" consisted of "Comprehensive Masonry Replacement" with "complete rebuilding/replacement of the existing brick masonry." K&H said that a complete brick replacement would "allow[] for correction of all observed deficiencies as well as functional enhancement of the brick masonry facades." K&H also stated that with Option 2, "[s]ome maintenance will be required in the future, however, it will be substantially less maintenance that in Option 1." K&H's report recommended implementation of Option 2, stating:

> "This solution most closely resembles the current brick masonry cladding construction, requires the least amount of additional engineering services and is most in keeping with the original design intent of the building. This solution is better than the original construction in that an AWRM may be readily provided, and that deficient masonry/window details may be revised and upgraded as part of the rebuilding effort."

¶ 17    The record reflects that K&H estimated that Option 1 would initially cost $6,926,208, but would entail an "Estimated 15 year maintenance" cost of $2,653,138, for a "Total Projected Cost for Option No. 1" of $9,579,366. K&H estimated that Option 2 would initially cost $9,392,773, with an "Estimated 15 year maintenance" cost of $115,735, for a "Total Projected Cost for Option No. 2" of $9,508,508.

¶ 18    **Dispute Between the Prior Board and Dissenting Unit Owners As to Which Option to Pursue**

¶ 19    Many unit owners desired the less costly Option 1, while many members of the Prior Board preferred Option 2. According to HHCA, in November 2011 (even *before* K&H's report was issued), the Prior Board informed the unit owners that it intended to levy a special assessment of $10-12 million to implement a complete replacement of the brick façade.

¶ 20    According to HHCA, the special assessment was promoted by six of the Prior Board's members, who were "motivated by their own personal interest." HHCA has alleged that the special assessment was "vehemently opposed by a minority of the Board, who in turn had the support of the vast majority of the unit owners."

¶ 21    According to HHCA, the unit owners who opposed Option 2 and the special assessment (Dissenting Unit Owners) represented a majority of the total votes of the association. HHCA alleged that, in late February 2012, certain Dissenting Unit Owners presented the Prior Board with a notice for a special meeting to vote on the special assessment, but the Prior Board ignored that notice.

¶ 22    On February 28, 2012, the Prior Board voted to authorize K&H to solicit bids to perform the Option 2 repairs. In early March 2012, the Dissenting Unit Owners sent notice of a special meeting to occur on March 27, 2012 to vote on whether to approve or reject the special assessment

for Option 2. At the March special meeting, 90% of the voting members voted (either in person or by proxy) to reject the special assessment. According to HHCA, the Prior Board refused to recognize that vote.

¶ 23 **Initiation of the Housing Court Case**

¶ 24 On March 13, 2012, the City of Chicago filed a complaint against HHCA relating to the water intrusion at the building, *City of Chicago v. Hemingway Associates*, *et al.*, 12 M1 400796 ("Housing Court Case.") The Housing Court Case was initiated after the City of Chicago Building Department received a complaint from a resident about water intrusion. According to HHCA, that resident's complaint to the Chicago Building Department was "at the instigation of certain of the Prior Board Members" in order to facilitate implementation of the Option 2 repairs. Kim represented the HHCA in the Housing Court Case.

¶ 25 **The July 10, 2012 Vote on the Special Assessment for Option 2**

¶ 26 While the Housing Court Case was pending, on June 29, 2012, the Prior Board sent to unit owners a notice (drafted by Kim) stating that a special assessment to implement Option 2 would be put "to a referendum vote of the association's unit owners" on July 10, 2012. The notice stated that a majority of the Board strongly supported a special assessment for Option 2 as "the best and long-term most economical way to solve a serious problem." The June 29, 2012 notice stated that on July 10, 2012, the Board would vote on the special assessment to fund Option 2, immediately followed by a special meeting of the unit owners "to hold a referendum vote on the Special Assessment *** pursuant to Section 18(a)(8) of the Illinois Condominium Property Act." The June 29, 2012 notice told unit owners that in the "days leading up to the July 10[th] referendum vote", they would receive background information on the project as well as a "a proxy for the unit owners meeting."

¶ 27    On July 3, 2012, (seven days before the July 10 meeting), the Prior Board mailed to the unit owners an "official" proxy form and instructions (drafted by Kim) stating that only the "official" proxy form would be recognized at the July 10 special meeting, and that all other proxy forms would be rejected. HHCA alleges that, at Kim's advice, the Prior Board delayed sending out the "official" proxy form until just before the July 4th holiday weekend, knowing that many unit owners would be out of town. HHCA claims this was intended to prevent unit owners from being able to vote against the Option 2 special assessment.

¶ 28    On July 10, 2012, the Prior Board approved a $12 million special assessment for Option 2. Shortly thereafter, the unit owners then voted on whether to accept the special assessment. According to HCAA, approximately 62.5% of the voting members—including those voting with either the "official" proxy or unofficial proxies—rejected the special assessment. HHCA acknowledges that, had the unofficial proxies been accepted and counted, the Option 2 special assessment would not have passed. However, allegedly "pursuant to the scheme devised by Kim", the Prior Board disregarded proxy votes that did not use the "official" form. Without counting the unofficial proxies, less than 50% of voting members rejected the special assessment. Thus, the Prior Board claimed that the special assessment and Option 2 had *not* been rejected by the unit owners, such that the special assessment was ratified pursuant to the Act.

¶ 29    **The Housing Court Orders Implementation of Option 2**

¶ 30    According to HHCA, Kim also "devised a scheme" to use the Housing Court Case to thwart the unit owners' opposition to Option 2. HHCA alleges that Kim proposed entry of order by which the HHCA would consent to implement Option 2 to address the building code violations alleged by the City of Chicago. On July 25, 2012, the circuit court presiding over the Housing Court Case (Hon. Lauretta Higgins Wolfson) entered an order directing that HHCA "must begin work to

perform repairs described in Option 2 of Klein & Hoffman's Engineering Report."[2] According to HHCA, Kim and the Prior Board intended this result, so that they could claim that Option 2 was "mandated by law."

¶ 31 **The Dissenting Unit Owners' Unsuccessful Derivative Action in Chancery Court**

¶ 32    On July 31, 2012, certain of the Dissenting Unit Owners filed a complaint styled as a derivative action in the Chancery Division of the Circuit Court of Cook County, *Beiler et al. v. Hemingway House Condominium Association, et al.*, 12 CH 28179 (Chancery Court Case). The plaintiffs sued "individually and derivatively" on behalf of themselves and other unit owners, naming as defendants HHCA and several members of the Prior Board. Plaintiffs in that case sought, *inter alia,* a declaration that all of the proxies presented at the July 10 meeting (not just the "official" proxies) were valid and should have counted against the special assessment, and that the results of the July 10 special meeting should be declared invalid. The complaint also sought injunctive relief to prevent the entry of any contract in furtherance of Option 2 or collection of the special assessment from unit owners.

¶ 33    On July 31, 2012, HHCA (through its attorney, Kim) filed a brief in opposition to the requested injunctive relief. That brief attached an affidavit from Peter J. Power, an architect and principal of K&H, stating that K&H continued to recommend Option 2. Power further stated his opinion, to a "reasonable degree of professional engineering certainty," that the conditions of the building constituted an "emergency" within the meaning of section 18(a)(8)(iv) of the Act. 765 ILCS 605/18(a)(8)(iv) (West 2012).

---

[2] Although HHCA's court submissions repeatedly refer to it as an "agreed" order, the actual order does not state that it is an "agreed" order.

¶ 34 The record reflects that in conjunction with the Chancery Court Case, the Dissenting Unit Owners retained the Thornton Tomasetti engineering firm to review K&H's proposed Option 2 and suggest alternatives. In a report dated August 28, 2012, Thornton Tomasetti offered its opinion that K&H's Option 2 was "overkill." Thornton Tomasetti indicated that more limited, conventional repairs would address the water infiltration: "[A] comprehensive facade restoration project that includes tuckpointing 100% of the mortar joints, repairing brick and concrete deficiencies, and replacing all of the windows provides a durable solution that will address the water infiltration issues at Hemingway House." Thornton Tomasetti estimated that the cost of such conventional repairs "would be $7,000,000 (vs. over $12,000,000 for K&H's Option 2)." However, Thornton Tomasetti's report did not state whether these more limited repairs would prevent water infiltration for the same duration as the more comprehensive Option 2.

¶ 35 The record reflects that the chancery court denied the Dissenting Unit Owners' request for a temporary injunction, and the Chancery Court Case was abandoned.

¶ 36 **The Option 2 Repairs Are Performed**

¶ 37 The record indicates that the Prior Board entered into a contract with a general contractor, Mark 1 Restoration (Mark 1), to implement Option 2. According to HHCA, the contract was amended (at Kim's advice) to include a provision imposing a $500,000 penalty on HHCA if it terminated the contract. HHCA claims this provision was added because Kim and the Prior Board recognized that the Prior Board members could be voted off the Board and replaced by persons opposed to Option 2.

¶ 38 Option 2 was ultimately implemented on three of the four sides of the building, while the fourth side was tuckpointed. Mark 1's final application for payment, submitted in 2015, indicated that the "grand total" cost for the Option 2 project amounted to $10,157,654.50.

¶ 39   **Removal of Prior Board Members and Commencement of This Litigation**

¶ 40     In September 2012, new board elections resulted in the removal of each of the Prior Board members who supported Option 2. Ben Beiler, one of the Dissenting Unit Owners, was elected president. The newly-elected Board (New Board) terminated Kim from acting as HHCA's counsel.

¶ 41     Following his termination, Kim unsuccessfully requested payment for legal fees incurred in his prior representation of HHCA.  In May 2013, Kim initiated this action by filing a complaint against HHCA, seeking to recover unpaid legal fees and lates fees totaling $22,118.40. In September 2013, HHCA filed its answer and initial counterclaim. HHCA filed its First Amended Counterclaim against Kim in April 2014.

¶ 42     In September 2015, HHCA filed a third-party complaint against K&H. In September 2016, HHCA filed an amended third-party complaint against K&H and a Second Amended Counterclaim, including counts against both HHCA and K&H.

¶ 43   **HHCA's Third Amended Counterclaim**

¶ 44     In March 2017, HHCA filed a third amended counterclaim, which is the focus of this appeal. That pleading contained five counts directed to Kim: breach of fiduciary duty (count I), aiding and abetting breach of fiduciary duty (count II), "aiding and abetting a scheme to defraud" (count III), civil conspiracy (count IV) and accounting (count V).[3]

¶ 45     Count I alleged that Kim breached fiduciary duties owed to the Board and the HHCA through various acts, including:

- developing a "scheme" for the Board to adopt Option 2 and a special assessment when it was opposed by a majority of unit owners;

---

[3] HHCA's separate claims against K&H were settled and dismissed.

- developing a "scheme" for Prior Board members to circumvent requirements of HHCA's Declaration and the Condominium Property Act;

- advising the Board not to accept or count certain proxies in the vote count at the July 2012 special meeting;

- causing the entry of an "agreed order" in the Housing Court case, thereby requiring HHCA to "repair the building based on the more costly scope of work contained in Option 2 for the improper purpose of claiming Option 2 was 'mandated by law' in order to circumvent the need to submit the Option 2 repair plan to a vote of the unit owners";

- advising the Board to disseminate notice of the July 2012 special meeting in a manner to prevent unit owners from voting against the special assessment by proxy.

¶ 46    In count II, HHCA alleged Kim aided and abetted the Prior Board Members in breaching their fiduciary duties to the HHCA and unit owners, insofar as Kim advised the Prior Board Members regarding the special assessment for Option 2. HHCA alleged that Kim "was the architect of the scheme by which the Prior Board Members sought to place their own personal interests and pecuniary interests in maximizing the value of their individual units over what was in the best interests of the Association and contrary to the wishes of the majority of unit owners."

¶ 47    Count III alleged that Kim aided and abetted a scheme to defraud. Specifically, that count alleged that the Prior Board Members sent a letter to unit owners containing false statements regarding the use of proxies. HHCA alleged that Kim assisted the Prior Board Members in a "scheme to defraud unit owners into revoking the proxies given to the Dissenting Unit Owners." In the "Civil Conspiracy" count (count IV), HHCA alleged "Kim conspired with K&H and the Prior Board Members to breach Kim's and the Prior Board Members' fiduciary duties to members of the Association and defraud members of the Association."

¶ 48    The final count of HHCA's counterclaim sought an "accounting" pertaining to Kim's billing statement.  HHCA averred that there was a need for discovery regarding the basis of the amounts claimed," and that Kim would be unjustly enriched if allowed to recover fees incurred in aiding, abetting, or conspiring with the Prior Board members.

¶ 49    Kim filed his answer and affirmative defenses in October 2017.

¶ 50    **Discovery**

¶ 51    The record reflects that the parties engaged in extensive discovery, including the depositions of Kim, several prior and current Board Members, City of Chicago Building Inspector Jose Aparacio, and the City's attorney in the Housing Court Case.

¶ 52    Significant for this appeal, HHCA responded as follows to Kim's interrogatory requesting a description of "any and all damages" claimed by HHCA:

> "Without waiving its prior objections, Defendant will seek compensatory damages in an amount that will place the Defendant in the position it would have been in had the Plaintiff not aided and abetted the former Board members to defraud the Defendant and the unitholders of the Property and breach their fiduciary duties. This sum consists of the amount of the loss occasioned by the Defendant and other unitholders at the Property as a proximate result of the Plaintiff's aiding and abetting the former Board members to defraud the Defendant and unitholders and breach their fiduciary duties, which amounts to actual out-of-pocket loss resulting from implementation of Klein and Hoffman Option 2.

This sum consists of the difference between the cost of implementing Klein and Hoffman's Option 2 (which totaled $9,508,508 before construction began and $12,800,000 projected after the project actually began) and the cost of implementing the option proposed by Thornton Tomasetti, Inc. (estimated at $6,850,000). Defendant will also seek any diminution in the value of individual units at the Property, if any, as a result of implementing Klein and Hoffman's Option 2, and any increased cost incurred to obtain financing to pay the special assessment that was imposed on unitholders as a result of implementing Klein and Hoffman Option 2. Defendant will also seek forfeiture and disgorgement of the attorneys' fees paid by the Defendant to the Plaintiff as compensation for his services during the period he aided and abetted the breach and the scheme to defraud. Defendant will also request an award of prejudgment interest at the statutory rate. Defendant will further seek punitive damages in an amount up to three times the amount of any compensatory award."

¶ 53   In April 2018, Kim issued requests for admission to HHCA, relating to whether the New Board properly voted to approve HHCA's participation in this litigation. After HHCA objected to those requests, Kim moved to strike HHCA's objections and deem certain facts admitted.

¶ 54   On May 31, 2018, after discovery had closed, Kim moved for leave to file amended affirmative defenses. He sought to add a defense that the New Board failed to vote to authorize HHCA's litigation against him in accordance with the Condominium Property Act (Act). At a

related evidentiary hearing, the court heard testimony from Beiler regarding the New Board's vote to approve HHCA's counterclaim against Kim. The court granted Kim's motion to strike, deemed the requests for admission admitted, and granted Kim leave to amend his affirmative defenses.[4] The court subsequently granted HHCA's motion to reconsider but denied its request to reopen discovery.

¶ 55 **Kim's Prior Motion for Summary Judgment and HHCA's Prior Appeal**

¶ 56 In August 2018, Kim moved for summary judgment. He argued, *inter alia*, that HHCA's defense and counterclaim were precluded by the Board's failure to authorize HHCA's participation in the litigation. HHCA filed a response in which in maintained that the New Board properly voted to approve the litigation at a July 2013 meeting, citing Beiler's testimony.

¶ 57 On October 26, 2018, the trial court granted Kim's motion for summary judgment, concluding that HHCA failed to present "evidence that it properly voted on the filing of its counterclaim in an open meeting" as required by the Act. The trial court found that Beiler's testimony indicated only an "informal meeting of the new Board" at which the litigation was discussed, but not a proper vote. In the same order, the trial court entered judgment in Kim's favor with respect to his claim for unpaid legal fees, awarding him $41,614, plus interest.

¶ 58 HHCA appealed (no. 1-19-060), challenging the trial court's entry of summary judgment to the extent it found that HHCA's counterclaim was not authorized by a proper vote.[5] In June 2020, this court reversed, finding a genuine issue of fact precluded summary judgment. *Kim v.*

---

[4] On October 22, 2018, Kim filed his "Second Affirmative Defenses."

[5] In its prior appeal, HHCA did not challenge the portion of the 2018 summary judgment order awarding Kim damages on his claim for unpaid legal fees. Likewise, the instant appeal concerns only the viability of HHCA's third amended counterclaim.

*Hemingway House Condominium Ass'n*, 2020 IL App (1st) 190603-U. We noted that although the trial court interpreted Beiler's testimony to reflect only an "informal meeting", Beiler repeatedly referred to a July 9, 2013 meeting at which the litigation was discussed in a closed executive session and then voted upon at an open meeting. As there was "conflicting evidence" regarding the circumstances of the vote, we found a genuine issue of material fact precluded summary judgment. *Id.* ¶ 35.

¶ 59    Our June 2020 order separately rejected Kim's suggestions that we could otherwise affirm summary judgment in his favor because the business judgment rule insulated the decisions of the Prior Board. *Id.* ¶¶ 36-37. We also rejected Kim's argument that we could independently affirm because Option 2 was "mandated by law" due to the order in the Housing Court Case. *Id.* ¶ 38.

¶ 60    Elsewhere in our June 2020 order, we separately rejected HHCA's claim that the court erred in permitting Kim to add a new affirmative defense based on the New Board's alleged failure to properly authorize the litigation. *Id.* ¶ 40. However, we also found that the trial court erred in denying HHCA's motion to reopen discovery in light of the new affirmative defense. *Id.* ¶¶ 43-44. Thus, we reversed the trial court's denial of HHCA's motion to reopen discovery and directed the trial court to permit "reasonable discovery on Kim's affirmative defense based on the Board's alleged failure to properly authorize HHCA's participation in this litigation." *Id.* ¶ 46.

¶ 61    **HHCA's Motion for Partial Summary Judgment**

¶ 62    Following remand to the circuit court, in February 2021, HHCA filed a Motion for Partial Summary Judgment, in which it sought findings that: (1) the special assessment should have been adopted pursuant to the provision of the Act applicable to special assessments for "additions or alterations"; (2) the Prior Board violated the Act by failing to do so; and that (3) in so doing, the Prior Board breached its fiduciary duties to the unit owners. According to HHCA, the special

assessment for Option 2 was governed by the provision of the Act requiring approval of at least two-thirds of the votes of all unit owners for "additions or alterations to the common elements." 765 ILCS 605/18(a)(8)(v) (West 2012). However, the Prior Board adopted the assessment under the provision by which a special assessment will be ratified unless a majority of the total votes of the unit owners are cast to reject it. 765 ILCS 605/18(a)(8)(ii) (West 2012)("if an adopted budget or any separate assessment adopted by the board would result in the sum of all regular and separate assessments payable in fiscal year exceeding 115% of the sum of all regular and separate assessments payable during the preceding fiscal year, the board of managers, upon written petition by unit owners *** shall call a meeting of the unit owners *** to consider the budget or separate assessment; unless a majority of the total votes of the unit owners are cast at the meeting to reject the budget or separate assessment, it is ratified.").

¶ 63    In his response, Kim argued the motion was improper insofar as HHCA sought findings as to legal issues that were not appropriate for summary determination. Kim otherwise argued that Option 2 was not an "addition or alteration" to common elements that would require approval by a two-thirds vote under section 18(a)(8)(v) of the Act. Rather, Kim argued Option 2 and the special assessment did not require approval of the unit owners, because there was an "emergency" within the meaning of section 18(a)(8) of the Act and because Option 2 was legally required by the July 2012 order in the Housing Court Case.

¶ 64    Kim separately asserted that it was improper for HHCA to seek a determination that the Prior Board Members breached their fiduciary duties, since they were not parties to this action and lacked "an opportunity to defend themselves." Kim otherwise argued that the business judgment rule applied to the decisions of the Prior Board Members.

¶ 65    **Kim's Renewed Motion for Summary Judgment**

¶ 66    On March 12, 2021, Kim filed a "Renewed Motion for Summary Judgment" in which he asserted a number of different grounds for dismissal of each of the five counts of the counterclaim. Kim primarily asserted that there was no evidence that HHCA suffered any damages from the implementation of Option 2.  Kim pointed out that HHCA's interrogatory response indicated its belief that its damages consisted of the difference between the cost of Option 2 and the cost of implementing conventional repairs. Kim argued although Option 2 was "more costly than Option 1", it was a "far-superior, longer-lasting fix to [the] water infiltration problem" that continues to benefit HHCA. Kim argued the evidence showed that Option 1 was merely a "stop-gap" measure, whereas Option 2 was longer-lasting and the "best permanent fix."

¶ 67    Kim further argued that any award of damages would result in a "windfall" for HHCA, because it already had the benefit of Option 2. That is, if HHCA could recover damages, HHCA "would have an upgraded, fully-repaired building and full payment for the upgrade" and would be "better off than they were before" this litigation.

¶ 68    Kim separately argued that under the doctrine of judicial estoppel, HHCA was precluded from arguing that Kim and the Prior Board acted improperly, given HHCA's positions in prior litigation. Kim pointed out that in the Chancery Court Case (before the change in Board membership), HHCA defended the Prior Board's actions. Kim averred that, in this case, HHCA had taken conflicting positions as to whether the Prior Board breached its fiduciary duties, whether Option 2 was a viable alternative, and whether the Prior Board "acted improperly in voting to allow the special assessment."

¶ 69    As a separate basis for summary judgment, Kim urged that HHCA could not overcome the business judgment rule and "attorney judgment." He argued that the Prior Board made a well-reasoned decision to adopt Option 2, relying upon qualified experts. He also argued that the Prior

Board reasonably relied on Kim's legal advice. Kim thus suggested HHCA could not establish the Prior Board committed a breach of fiduciary duty, and so "the allegations of conspiracy and aiding and abetting [against Kim] must fail." Kim similarly asserted that under the doctrine of "judgmental immunity", he could not be held liable for advice to the Prior Board that was the result of his honest exercise of professional judgment.

¶ 70    Kim elsewhere urged HHCA failed to identify any evidence that any Prior Board member breached a fiduciary duty, engaged in a conspiracy with Kim, or engaged in a scheme to defraud. Rather, he asserted the evidence established that Prior Board members acted reasonably and relied on professional advice. Finally, Kim asserted that HHCA failed to offer any reason why an accounting was necessary.

¶ 71    On April 9, 2021, HHCA filed its opposition to Kim's motion for summary judgment. In response to Kim's argument that HHCA had not identified any damages, HHCA cited its interrogatory response and maintained that "its damages are the difference between the cost of Option 2 estimated to be 12.8 million and the cost of Option 1 estimated to be $6.85 million." HHCA also cited evidence of the cost disparity between the two options, including "Final Payment Certification" from Mark 1 indicating that the total cost to implement Option 2 was $10,157,654.50. HHCA also pointed out that K&H, Thornton Tomasetti, and BTC estimated a much lower cost for Option 1, *i.e.* conventional repairs. HHCA thus claimed there was "ample evidence of HHCA's damages."

¶ 72    Insofar as Kim's motion argued that Option 2 was a superior and "longer-lasting fix", HHCA responded that "Option 2 was "a more expensive alternative than necessary to address the water intrusion". HHCA cited Thornton Tomasetti's August 2012 report stating that Option 2 was

"overkill." HHCA did not dispute that Option 2 was a longer-lasting solution than Option 1, but claimed that Thornton Tomasetti's report indicated that "Option 1 would have worked fine."

¶ 73    With respect to Kim's reliance on judicial estoppel, HHCA argued that even assuming the necessary factors were present, the doctrine should not be applied if there is no "intent to mislead." HHCA argued application of the doctrine would be unjust, since HHCA's inconsistent positions were caused by the fact that the Prior Board caused it to take positions in the Housing Court Case that were the opposite of its positions under the New Board.

¶ 74    With respect to the business judgment rule, HHCA argued that it would not shield Kim from liability, regardless of whether Option 2 was reasonable. HHCA claimed that the business judgment rule did not apply because the Prior Board did not take due care and acted in bad faith, including by failing to investigate "less costly alternatives" to Option 2. HHCA also asserted that the Prior Board acted in bad faith by, *inter alia*, (1) failing to adopt the special assessment under the provision of the Act applicable to additions or alterations of common elements, (2) failing to accept proxy votes other than the "official" proxy for the July 2012 vote on the special assessment, and (3) unreasonably relying on Kim's advice to reject the unofficial proxies, which resulted in suppression of votes against the special assessment.

¶ 75    HHCA elsewhere argued that Kim could not rely on "judgmental immunity" because that doctrine "applies only to legal malpractice cases" and to attorney conduct during litigation. HHCA further argued that judgmental immunity would not apply because "Kim's advice to the Prior Board was not in good faith."

¶ 76    HHCA otherwise argued that Kim, as movant, failed to "present any evidence or authority that precludes HHCA from establishing an element of a cause of action." HHCA argued it had raised issues of fact as to whether the  Prior Board breached its duties to unit owners. With respect

to the conspiracy count, HHCA maintained that it demonstrated that "Kim and the Prior Board collaborated to violate the Act to the detriment of the unit owners." With respect to the count seeking an accounting, HHCA also claimed Kim had not meet his burden on summary judgment to "show that there is no genuine issue of material fact that there is no reason for an accounting."

¶ 77    In his reply in further support of his renewed motion for summary judgment, Kim again urged that there was no evidence to support any damages, as HHCA's only alleged damage was the cost differential between Option 1 and Option 2. Kim argued that HHCA did not address the fact that it "benefits from the more expensive option." Kim averred that since the building continues to enjoy the benefit of Option 2, an award of the claimed damages would amount to a "multi-million dollar windfall to HHCA." Kim acknowledged that Option 2 was more expensive than Option 1, but emphasized that this was because Option 2 was a "long-term fix" to the water intrusion problem. Kim argued any monetary judgment would result in HHCA being "better off than it was if Option 1 was originally implemented", contrary to the law of compensatory damages.

¶ 78    Kim otherwise argued in his reply that the business judgment rule applied because the Prior Board relied on the recommendations of engineers (BTC and K&H) in selecting Option 2; the Prior Board properly relied on Kim's legal advice; and the courts in the Chancery Court Case and Housing Court Case agreed with implementation of Option 2. Kim also reasserted his position that "judgmental immunity" applied, because his advice had been well-reasoned.

¶ 79    **The Court Denies HHCA's Motion for Partial Summary Judgment And Enters Summary Judgment for Kim on Four of the Five Counts of the Counterclaim**

¶ 80    On August 5, 2021, the court entered an order (1) denying HHCA's motion for partial summary judgment and (2) granting Kim's motion for summary judgment with respect to four of

HHCA's counterclaims. That order did not reference the counterclaim' count for breach of fiduciary duty.

¶ 81    The court first addressed HHCA's partial motion for summary judgment. The court found that the motion was improper, insofar as it sought findings that the Prior Board's actions did not comply with the Act. The court noted that section 1005(d) of the Code of Civil Procedure only permits a summary determination of facts that are "major issues in the case." 735 ILCS 5/2-1005(d) (West 2020). The court remarked that HHCA was "essentially seeking an advisory opinion that [the Prior Board] acted improperly. These issues are not 'facts' and do not form essential elements of HHCA's claim against Kim." The court also indicated it was improper for HHCA to seek a finding that Prior Board members breached their fiduciary duties, when they were not parties in this action. The court otherwise found "significant issues of fact that would preclude a finding regarding actions of [the Prior Board]", including evidence "supporting application of the business judgment rule."

¶ 82    Turning to Kim's motion for summary judgment, the court emphasized that, while HHCA accused Kim of aiding and abetting the Prior Board's wrongful conduct, HHCA had never directly sued members of the Prior Board. The court noted that to prove that Kim aided and abetted a breach of fiduciary duty, HHCA would need to show that the Prior Board breached its fiduciary duty.  However, the court found that the evidence "does not establish any breach of fiduciary duty or fraud" by the Prior Board. The court found that, "without a proven breach of fiduciary duty or fraud by Kim or by [the Prior Board]," HHCA's counterclaims for aiding and abetting breach of fiduciary duty (count I) and aiding and abetting a scheme to defraud (count II) could not be sustained. As for the civil conspiracy count against Kim (count III), the court found "[n]o evidence

has been presented that there existed 'coconspirators' who committed an 'overt tortious or unlawful act," so Kim was entitled to summary judgment on that count.

¶ 83    The court proceeded to find that Kim was also entitled to summary judgment on the counterclaim seeking an accounting. The court recited that, to sustain an action for an accounting in equity, the complaint "must allege the absence of an adequate remedy at law and one of the following: a breach of fiduciary relationship, a need for discovery, fraud, or the existence of mutual accounts which are of a complex nature." (citing *Peddinghaus v. Peddinghaus*, 295 Ill. App. 3d 943 (1998). The court found that HHCA had not established a "breach of [a] fiduciary relationship between the parties or fraud."

¶ 84    In subsequent portions of the same order, the court went on to conclude that Kim was also entitled to summary judgment due to (1) lack of damages, (2) estoppel; and (3) application of the business judgment rule.

¶ 85    With respect to damages, the court recognized that HHCA claimed its damages consisted of the cost difference between Option 1 and Option 2. The court reasoned that "if the court were to rule as a matter of law that HHCA can seek damages in this case, it would permit HHCA to enjoy a windfall" as it already had an "upgraded, fully-repaired building." The court noted that HHCA did not dispute that Option 2 was successfully completed, but took the position that "something less expensive should have been done." The court emphasized that HHCA "does not argue that it did not receive the complete benefit of Option 2's $12.8 million repair, just that HHCA would rather it have received Option 1 at a lower cost." The court found HHCA "failed to establish that it has been damaged by Option 2."

¶ 86    Separately, the court agreed with Kim that HHCA was  "judicially estopped" from alleging that Kim and the Prior Board acted improperly, because HHCA defended the Prior Board's actions

in the Chancery Case and the Housing Court Case. The court agreed with Kim that HHCA could not " 'switch positions' in this litigation."

¶ 87    The court further found that summary judgment was warranted by the "business judgment and attorney judgment rules." The court cited the proposition that if a board properly exercises its business judgment in interpreting its own declarations, it does not breach its fiduciary duty if it was sufficiently informed. The court found the evidence showed that in selecting with Option 2, the Prior Board "relied on retained, qualified experts" and "chose the option recommended by the only independent experts who recently viewed the building." The court also noted that the decision to proceed with Option 2 was "approved" by the Housing Court Case order requiring HHCA to implement Option 2.

¶ 88    The court's August 5, 2021 order thus (1) denied HHCA's motion for partial summary judgment and (2) granted Kim summary judgment on "HHCA's four counterclaims."

¶ 89    **<u>The Court Grants Summary Judgment in Kim's Favor on the Remaining Count</u>**

¶ 90    Shortly thereafter, HHCA filed a motion pointing out that the August 5, 2021, order referenced four of its claims against Kim but did not rule on HHCA's remaining count for breach of fiduciary duty (count I). On August 19, 2021, the court entered an "Order to Clarify" its prior order, specifying that it was also entering summary judgment in Kim's favor with respect to count I of the counterclaim.[6]

¶ 91    The court noted that a claim for breach of fiduciary duty against an attorney is "essentially a legal malpractice claim" and that "actual damages are an essential element of a claim for

---

[6] The court acknowledged that its prior order had not separately discussed that claim, because Kim's motion for summary judgment had not "explicitly" sought dismissal of count I. However, the court recognized that the prayer for relief in Kim's motion sought summary judgment as to "all Counts" in HHCA's counterclaim.

professional wrongdoing." The court proceeded to find that HHCA could not establish damages to support a beach of fiduciary duty claim against Kim, because it could not show damages resulting from implementation of Option 2. The court noted that HHCA's interrogatory response indicated it sought damages to place it "in the position it would have been in" had Kim not assisted the Prior Board in implementing Option 2. However, the court reasoned that:

> "[V]iewing the matter practically, it is impossible to put HHCA in the position it would have been in since that would require removal of the work performed. To this day, HHCA enjoys the benefit of Option 2, a repair that is presented to be of a longer-lasting fix to its water infiltration problem ***. Although Option 2 was more costly than Option 1, it carried added benefits, and HHCA does not dispute this. HHCA is simply unable to cite any case law or legal authority that permits speculative damages of this nature."

The court indicated that a damages award would permit HHCA to "enjoy a windfall" and be "better off than they were before this suit."

¶ 92　The court concluded that "regardless of whether [the Prior Board] or Kim acted improperly, there simply is no evidence that HHCA was damaged" by implementation of Option 2. On that basis, the court found that Kim was also entitled to summary judgment on count I of the third amended counterclaim.

¶ 93　HHCA filed a timely notice of appeal, specifying that it sought reversal of (1) the portion of the August 5, 2021 order granting Kim summary judgment on four of the five counterclaims; (2) the portion of that order denying HHCA's motion for partial summary judgment, and (3) the

August 19, 2021 order granting Kim summary judgment on the remaining count for breach of fiduciary duty.

¶ 94    After HHCA's opening brief was filed, Kim filed a motion to strike the portion of HHCA's opening brief challenging the denial of HHCA's motion for partial summary judgment, claiming this court is without jurisdiction to review that ruling. That motion was taken with the case.

¶ 95    ANALYSIS

¶ 96    On appeal, HHCA urges that the trial court erred in granting summary judgment to Kim on each of the five counts of its counterclaim.  HHCA separately argues that the court erred in denying its motion for partial summary judgment.

¶ 97    With respect to entry of Kim's summary judgment motion, HHCA contends that summary judgment was erroneous on a number of bases.  It asserts there was evidence that Kim aided the Prior Board Members in breaching their fiduciary duties, including by advising the Prior Board to adopt the special assessment for Option 2 under the incorrect provision of the Act. HHCA maintains there is evidence showing that Option 2 was an addition or alteration to the common elements, such that the special assessment required the vote of two-thirds of unit owners under section 18(a)(8)(v) of the Act. 765 ILCS 605/18(a)(8)(v) (West 2012).

¶ 98    HHCA also asserts that the circuit court erred in finding no evidence that the Prior Board members committed fraud against the unit owners, including with respect to the Prior Board's decision to only count those proxy votes cast with the "official" proxy form. HHCA maintains there is evidence that the Prior Board deliberately failed to properly inform unit owners that only "official" proxy votes would be counted in the July 2012 vote on the special assessment.

¶ 99     HHCA elsewhere argues that the court erred, insofar as it granted summary judgment due to lack of evidence of damages. HHCA maintains that it was damaged because Option 2 was costlier than Option 1.

¶ 100   HHCA elsewhere asserts that the circuit court erred to the extent that it applied judicial estoppel arising from HHCA's earlier positions in the Housing Court Case and the Chancery Court Case. HHCA also urges that the circuit court erred in relying on the business judgment rule. Insofar as the circuit court repeatedly noted that HHCA did not sue any of the Prior Board members, HHCA maintains that those individuals were not necessary parties.

¶ 101   In addition to its challenges to the entry of summary judgment in Kim's favor,  HHCA maintains the court erred in denying its motion for partial summary judgment. HHCA contends that the issue of whether Option 2 involved "additions or alterations" within the meaning of the 18(a)(8)(v) of the Act was a proper factual issue for summary determination.

¶ 102   As discussed below, we agree with the trial court that Kim was entitled to summary judgment because HHCA failed to establish proof of an injury or damages to support any cause of action in the third amended counterclaim. To be clear, we do not take a position as to whether Kim or the Prior Board engaged in improper conduct related to Option 2 and the corresponding special assessment. Nevertheless, even assuming that Kim and the Prior Board committed the alleged wrongful conduct, the record does not show any cognizable resulting injury, as it is undisputed that HHCA obtained the expected benefits of Option 2. Although Option 2 was costlier than Option 1, Option 2 was a longer-lasting solution, from which the building continues to benefit. The absence of an actual injury or damages is dispositive in Kim's favor, regardless of whether we would otherwise condone his conduct.

¶ 103 **Standard of Review**

¶ 104 "Summary judgment is appropriate only where 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 25 (quoting 735 ILCS 5/2-1005(c) (West 2012)). "In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admission, and affidavits strictly against the movant and liberally in favor of the opponent." *Lewis v. Lead Industries Ass'n*, 2020 IL 124107, ¶ 15.

¶ 105 Insofar as Kim sought summary judgment with respect to HHCA's counterclaim, Kim was in the position of a defendant seeking summary judgment. "A defendant moving for summary judgment may meet its initial burden of proof by affirmatively showing that some element of the case must be resolved in his favor or by establishing that there is an absence of evidence to support the nonmoving party's case. [Citation.]" *Freedberg v. Ohio Nat. Ins. Co.*, 2012 IL App (1st) 110938, ¶ 25. "Although a plaintiff is not required to prove his case at the summary judgment stage, in order to survive a motion for summary judgment, the nonmoving party must present a factual basis that would arguably entitle the party to a judgment. [Citation.]" *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002). Put differently, "[i]f the plaintiff fails to establish any element of the cause of action, summary judgment for the defendant is appropriate. [Citations.]" *Lewis*, 2020 IL 124107, ¶ 15.

¶ 106 "In appeals from summary judgment rulings, the standard of review is *de novo*. [Citations]" *Lewis,* 2020 IL 124107, ¶ 15. We keep in mind that "we review only the court's ultimate judgment, not its reasoning in support of that judgment." *Jarosz v. Buona Companies*, *LLC*, 2022 IL App (1st) 210181, ¶ 29 (citing *Makowski v. City of Naperville*, 249 Ill. App. 3d 110, 115 (1993)). Thus,

we may affirm a grant of summary judgment on any ground apparent from the record. *Catom Trucking, Inc. v. City of Chicago*, 2011 IL App (1st) 101146, ¶ 9.

¶ 107   Here, although the trial court offered several reasons for granting summary judgment on each of the five counterclaims, we need not discuss them all to affirm. The record is clear that HHCA suffered no cognizable injury or compensable damages from the implementation of Option 2. Although that option was more expensive than the conventional repair option (Option 1), there is no dispute that there was a legitimate reason for this: Option 2 conferred the benefit of a more comprehensive, longer-lasting solution, corresponding to its higher cost. HHCA has never disputed that Option 2 was superior in this respect, or claimed that Option 2 has not provided the expected benefit. Accordingly, HHCA cannot prove an injury or damages to sustain any of the five counts of the counterclaim.

¶ 108   **HHCA Did Not Suffer an Injury Merely Because Option 2 Was Costlier Than Option 1**

¶ 109   As the circuit court recognized, the entire basis of HHCA's claimed injury is that the Prior Board (with Kim's advice) adopted a comprehensive repair solution (Option 2) that was more expensive than the conventional repair program (Option 1) that many unit owners preferred. That is, HHCA's theory of recovery is that the Prior Board's solution was "overkill" and more expensive than necessary. However, we find no basis in law for finding that the mere fact of a cost differential equates to an actual injury or compensatory damages. Indeed, since HHCA has never claimed that Option 2 has not performed as expected or that it was not worth its higher cost, any award of damages would amount to a windfall for HHCA.

¶ 110   We recognize that although the counterclaim contained five separate counts, a showing of an actual injury is a necessary component for *any* cause of action. Our supreme court "has

repeatedly 'observe[d] that, because a plaintiff can sustain a cause of action only where he or she has suffered some injury to a legal right, harm caused by the defendant's conduct is an essential element of every cause of action.'" *Lewis*, 2020 IL 124107, ¶ 29 (quoting *Lutkauskas v. Ricker*, 2015 IL 117090, ¶ 31). "The wrongful or negligent act of the defendant, by itself, gives no right of action to anyone. *Until the defendant's wrongful or negligent act produced injury to the plaintiff's interest by way of loss or damage, no cause of action accrues*." (Emphasis added). *Lewis*, 2020 IL 124107, ¶ 29; see also *Nettleton v. Stogsdill*, 387 Ill. App. 3d 743, 748 (2008) (even if an attorney is proven negligent, "a plaintiff cannot recover for legal malpractice unless he also proves that the attorney's negligence proximately caused her damages."). Similarly, we recognize that "[t]he purpose of compensatory tort damages is to compensate [citation]; it is not the purpose of such damages to punish defendant or bestow a windfall upon plaintiffs." *Willis v. Foster*, 229 Ill. 2d 393, 401 (2008).

¶ 111   Here, even if Kim and the Prior Board engaged in the alleged wrongful conduct, the record shows no injury or damages. Importantly, HHCA's sole theory of injury is that Kim's wrongful conduct caused the implementation of Option 2, which was more costly than Option 1. In its interrogatory responses and in opposition to Kim's motion for summary judgment, HHCA took the position that "its damages are the difference between the cost of Option 2 estimated to be 12.8 million and the cost of Option 1 estimated to be 6.85 million." On appeal, HHCA likewise acknowledges that its theory of damages is solely premised on "the difference between the actual cost of the Option 2 repairs and the estimated cost of the Option 1 repairs."

¶ 112   There is no dispute that Option 2 was more expensive than Option 1. Yet, that does not mean that HHCA suffered an injury. Significantly, the record makes apparent that Option 2 was more expensive for good reason: it was a more comprehensive solution—complete replacement of

the building's brick masonry—that was expected to be longer-lasting and require lower future maintenance costs than the more limited repairs under Option 1. This is made clear by K&H's February 2012 report to HHCA discussing the pros and cons of various options and explaining its recommendation of Option 2. K&H explained that while Option 1 cost less, it "will not eliminate the water infiltration problems" and would entail higher maintenance costs in the ensuing years. In contrast, K&H explained that the complete brick replacement in Option 2 would "allow[] for correction of all observed deficiencies" and would require "substantially less maintenance" than Option 1. K&H also recommended Option 2 because it "requires the least amount of additional engineering services", was "most in keeping with the original design intent of the building" and was "better than the original construction" in that it would include an all-weather resistant barrier. Notably, HHCA does not cite any evidence contradicting these statements.

¶ 113   We recognize that HHCA cites Thornton Tomasetti's August 28, 2012 report as evidence that "Option 1 and Option 2 would have accomplished the same purpose" and were "equally effective at curing the water intrusion." However, this mischaracterizes the document. To be sure, Thornton Tomasetti opined that Option 2 was "overkill" and that "conventional repairs" would address the water infiltration issues for $7 million, several million dollars less than the projected cost of Option 2. While the Thornton Tomasetti report indicated that conventional repairs would provide a "durable solution that will address the water infiltration issues", contrary to HHCA's suggestion, it does not state that it was equal in durability to Option 2.  Nor does that report support HHCA's suggestion that either Option 1 or 2 "would have resulted in the same 'upgrade' to the building because both would have stopped the water leakage." While both solutions may have worked as an *immediate* solution to the water intrusion, there is no evidence that Option 1 and 2

were equally durable or cost-effective. As the trial court recognized, HHCA has never disputed that Option 2 offered longer-lasting protection than more limited, cheaper repairs of Option 1.

¶ 114    Furthermore, HHCA has not disputed that it has, in fact, received the full expected benefit of Option 2. HHCA has never suggested that Option 2 has been ineffective in addressing the water intrusion in the several years since it was implemented. Nor does it offer any evidence to dispute that Option 2 will continue to be effective for years to come with far less required maintenance costs than would have been required for Option 1.

¶ 115    Instead, HHCA suggests that it suffered a compensable injury because the Prior Board (with Kim's help) did not implement the cheapest solution to address the immediate water intrusion problem. In other words, HHCA claims it was damaged because Option 2 was more thorough and expensive than necessary, *i.e.* that it was "overkill."

¶ 116    This theory of injury is not supported by the record or the law. HHCA does not cite to any legal authority suggesting that a plaintiff may premise an injury on defendant electing a more comprehensive, expensive solution than a cheaper alternative, especially where there is undisputed evidence of a legitimate reason why the selected option was costlier.

¶ 117    We emphasize that HHCA did not identify any evidence to suggest that Option 2 has not, or will not continue to, confer the longer-term benefit corresponding to its higher cost. That is, it has not disputed that Option 2 was actually worth its price. In turn, HHCA has not established an injury resulting from Kim's allegedly wrongful conduct. Indeed, an award of damages would put the HHCA in a *better* position that it was before – that is, it would continue to experience the benefit of Option 2, plus additional damages.

¶ 118    This result would be contrary to our precedent. It is well-settled that compensatory damages should not put plaintiff in a better position than before the wrongful conduct, as it would

result in an improper windfall.  See *Eastman v. Messner*, 188 Ill. 2d 404, 411-12 (1999) (a plaintiff who recovers in a legal malpractice suit against a former attorney cannot be put in a better position by suing the attorney than had the underlying action been successful, and so a plaintiff's damage are "limited to the actual amount the plaintiff would have received had he been successful in the underlying case"); *Nettleton*, 387 Ill. App. 3d at 749 ("A successful legal malpractice claim places the plaintiff in the same position that she would have occupied but for the attorney's negligence"); *Arthur v. Catour*, 345 Ill. App. 3d 804, 806 (2004) (the purpose of compensatory tort damages is to compensate the plaintiff, not to punish defendants or "bestow a windfall upon plaintiffs" (quoting *Wilson v. Hoffman Group, Inc*. 131 Ill. 2d 308, 321 (1989)).

¶ 119   We briefly note that HHCA suggests that, even if there are no legitimate compensatory damages, it should be able to seek nominal damages, and in turn could seek punitive damages. However, HHCA's third amended counterclaim did not seek nominal or punitive damages. Moreover, "In order to be entitled to punitive damages, one must allege outrageous conduct, acts perpetrated by evil motive or with reckless indifference to the rights of others."  *Guice v. Sentinel Technologies, Inc*. 294 Ill. App. 3d 97, 110-111 (1997).  HHCA's counterclaim does not meet these pleading requirements.

¶ 120   Before concluding, we wish to emphasize that this decision should not be construed as a determination as to the propriety of Kim and the Prior Board's conduct. We specifically note we are troubled by the allegations pertaining to the manner in which the Prior Board (with Kim's assistance) notified the unit owners of the July 2012 special meeting for a referendum on the special assessment and their decision to require an "official" proxy form for that meeting.  We note that section 5.05 of the HHCA's declaration requires notice of a special meeting to be delivered at least 10 days before the meeting. Here, the record reflects that the notice was sent on June 29,

2012, more than 10 days before the scheduled meeting. Yet, inexplicably, the "official" proxy form was not sent until seven days before the meeting, July 3, 2012.[7] And as HHCA emphasizes, that was the day before the July 4th holiday, when it would be reasonable to expect that some unit owners would be unavailable. This raises legitimate concerns as to whether this timing was intended to preclude participation in the July 10, 2012 vote.

¶ 121   The parties dispute whether it was permissible for the Prior Board to (1) designate an "official" proxy for the July 10, 2012 meeting and (2) distribute that form on July 3, 2012. The parties do not identify any controlling precedent on these issues. However, even if the Prior Board's conduct is questionable, this is unavailing to HHCA, as it does not affect the lack of an identifiable resulting injury. This poses an independent barrier to its claims for relief, even if we were to otherwise find that Kim and the Prior Board's conduct was deceptive or breached their fiduciary duties.

¶ 122   In summary, we find that there is no evidence of an injury or damages to sustain any of the causes of action in HHCA's third amended counterclaim. On this basis, we affirm the entry of summary judgment in Kim's favor on all five causes of action. As the lack of injury or damages is dispositive, we need not address any of the parties' remaining arguments as to the other bases for dismissal identified by the circuit court, such as judicial estoppel and the business judgment rule.

¶ 123   Similarly, in light of our determination that HHCA cannot sustain any portion of its counterclaim, there is no need for us to address HHCA's challenge to the denial of its motion for partial summary judgment.  In that motion, HHCA sought findings that the Prior Board breached

---

[7]The parties do not identify any provision of the Declaration indicating whether the Board may require an "official" proxy form for a particular meeting of unit owners, or when such form must be distributed.

its fiduciary duties because it adopted the special assessment for Option 2 under the wrong provision of section 18(a) of the Act, in order to avoid the requisite approval by two-thirds of unit owners. However, even if those claims were otherwise meritorious, HHCA has not identified any cognizable injury resulting from the implementation of Option 2. Thus, HHCA cannot avoid summary judgment, regardless of whether its motion for partial summary judgment had merit.[8]

¶ 124   For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 125   Affirmed.

---

[8] In light of this conclusion, Kim's motion in this court to strike the portion of HHCA's opening brief regarding denial of HHCA's motion for partial summary judgment is rendered moot.